[No. 42670-2-I. Division One. July 12, 1999.]

ALPINE LAKES PROTECTION SOCIETY, *Respondent*, V. THE DEPARTMENT OF NATURAL RESOURCES, ET AL., *Appellants*.

2

4

*Christine O. Gregoire, Attorney General,* and *Cheryl Ann Nielson, Maia D. Bellon,* and *Patricia H. O'Brien, Assistants,* for appellants Department of Natural Resources, Department of Ecology, and Forest Practices Board.

*John W. Hempelmann* and *Brian L. Holtzclaw* (of *Cairncross & Hempelmann, P.S.*); and *Janet E. Garrow,* for appellant Plum Creek Timber Co.

*Peter R. Goldman* (of *Washington Forest Law Center*) and *Todd D. True* (of *Earthjustice Legal Defense Fund*), for respondent.

KENNEDY, C.J. — The Washington State Department of Natural Resources (DNR), the Washington State Department of Ecology (DOE), the Washington Forest Practices Board (FPB) and Plum Creek Timber Company (Plum Creek) appeal a judgment of the King County Superior Court overturning DNR's modified determination of

nonsignificance with respect to the Alps Watershed Analysis prepared by Plum Creek. The court ordered that the watershed analysis be disapproved pending completion of an environmental impact statement (EIS), and also ordered that a series of geotechnical prescriptions contained in the watershed analysis be revised to explicitly require consideration of cumulative impacts in developing any alternative to a no-action prescription contained in the analysis. DNR also appeals the superior court's award of attorney fees to Alpine Lakes Protection Society (ALPS) under the equal access to justice act, RCW 4.84.340-.360, for attorney fees incurred at the administrative level and in superior court. We hold that the Washington Forest Practices Appeals Board (FPAB) erred in ruling by summary judgment that an EIS is not required based on the reasoning that approval of the watershed analysis and selection of geotechnical prescriptions, in and of themselves, will have no probable significant adverse environmental impact. But the superior court erred in requiring an EIS—that is a decision to be made by the FPAB after considering future, albeit as yet unproposed, forest practices. Moreover, the geotechnical prescriptions are not defective for failure to explicitly require consideration of cumulative effects in developing alternative prescriptions, in that the purpose of the entire watershed analysis process is to address the cumulative effects of forest practices on the public resources of fish, water and public capital improvements and the language of the geotechnical prescriptions is consistent with this purpose. The superior court erred in awarding ALPS attorney fees incurred at the administrative level but did not err in awarding fees incurred at the judicial review level. Accordingly, we affirm in part and reverse in part. We remand to the superior court for such adjustments as may be appropriate in the attorney fee award in light of the decision on appeal. And we remand to the FPAB for a fact-finding hearing on whether an EIS must be prepared.

## REGULATORY BACKGROUND

Forest practices in Washington are governed by the Forest Practices Act, chapter 76.09 RCW, and State Environmental Policy Act (SEPA), chapter 43.21C RCW. The Forest Practices Act authorizes the Forest Practices Board to adopt forest practice rules, and to the extent that the rules relate to water quality the DOE must also promulgate these rules. RCW 76.09.040, .050. The FPB is specifically delegated the task of establishing by rule which forest practices fit into each of four defined classes, based on their potential environmental impact: Class I, Class II, Class III and Class IV. The DNR administers and enforces the forest practice rules. RCW 76.09.040. The FPAB hears appeals arising from actions of DNR under the act. RCW 76.09.220(7).

SEPA review is required for Class IV forest practices, but Class I, II and III forest practices are exempt from SEPA review. RCW 76.09.050(1); RCW 43.21C.037(1). Class IV forest practices are those "which have a potential for a substantial impact on the environment and therefore require an evaluation by [DNR] as to whether or not an [EIS] must be prepared...." RCW 76.09.050(1); RCW 43.21C-.037(3).

In 1992, the FPB and DOE adopted major changes to the forest practice rules, a major component of which was the creation of a process for gathering information about watersheds, known as watershed analysis. *See generally* chapter 222-22 WAC. A watershed analysis is performed on a watershed administrative unit, a discreet hydrological unit defined by DNR in cooperation with others having expertise on watersheds. WAC 222-22-020. The watershed analysis rules explain the policy and framework of watershed analysis, while the details of the methodology are contained in the Standard Methodology for Conducting Watershed Analysis included in the Forest Practices Board Manual. The watershed analysis rules require DNR to set minimum qualifications for analysts, specialists and field managers

who conduct watershed analyses, to register them and to monitor their performance. WAC 222-22-030. Watershed analyses may be conducted by DNR or by the owner or owners of 10 percent or more of the nonfederal forest land acreage in a watershed analysis unit. Owners proposing to conduct a watershed analysis must give notice to DNR, identifying the scientists who will do the work, and DNR then determines whether these people are qualified. WAC 222-22-040.

■ The watershed analysis rules are designed to evaluate and mitigate the cumulative effects of forest practices on fish, water and capital improvements of the state and its political subdivisions, and to preserve and protect these valuable public resources while maintaining a viable forest products industry. The rules are "intended to be applied and should be construed in such a manner as to minimize the delay associated with the review of individual forest practice applications and notifications by increasing the predictability of the process and the appropriate management response." WAC 222-22-010(1), (5).

The first step in a watershed analysis is resource assessment. During this phase, qualified scientists gather and interpret data about the watershed and assess resource conditions to define areas of resource sensitivity based on the risk to fish, water and public capital improvements from the cumulative effects of forest practices. The scientists prepare written reports identifying and mapping areas of resource sensitivity—areas where standard forest practices rules will not adequately protect the resource and thus require a management response to minimize, prevent or avoid risk of adverse change. WAC 222-22-050(2)(d), (f).

Once the resource assessment is completed, a team of qualified field managers develops a set of prescriptions, exceeding standard forest practices rules, designed to minimize, prevent or avoid the likelihood of adverse change to the specific sensitive resource. WAC 222-22-070(3). For example, a prescription might prohibit building of roads on certain steep slopes to avoid delivery of sediment to a stream segment containing a vulnerable fish source.

DNR then reviews the draft watershed analysis and circulates copies to the Departments of Ecology, Fish, and Wildlife, to affected tribes, local governments, other landowners in the watershed administrative units, and to the public for review and comment. DNR also reviews the proposed prescriptions and issues a threshold determination using the process in the SEPA rules. WAC 197-11-310 to -360. If DNR determines that there will be no probable significant adverse environmental impacts upon approval of the watershed analysis, it issues a determination of nonsignificance. If probable significant adverse impacts are found that cannot be mitigated through clarification or change in the prescriptions, a determination of significance is issued and an EIS is required. RCW 43.21C.030(2); WAC 197-11-350, -360(1), (4).

Following the final adoption of prescriptions, any forest practices application submitted in an area of resource sensitivity must either follow the prescriptions for that area, contain an alternate plan that meets or exceeds the protection of the prescriptions, or be considered a Class IV —Special and undergo SEPA review. WAC 222-22-090(1); WAC 222-16-050(1)(h). Each set of prescriptions must provide an opportunity for a forest practices applicant to present an option for an alternate plan which the applicant shows meets or exceeds the protection provided by the other prescriptions approved for a given area of resource sensitivity. WAC 222-22-070(3)(b).

■ Ultimately, the aim of a watershed analysis is to allow forest practice permits to be processed and approved without going through individualized environmental analysis. If DNR determines that a forest practices applicant will employ the prescriptions specified by the watershed analysis, the department shall not further condition forest practice applications in an area of resource sensitivity except for reasons other than the watershed processes and fish, water and capital improvements of the state (except to correct mapping errors and similar factual errors). WAC 222-22-090(1)(d). DNR's authority to condition the size of clearcuts

in significant rain-on-snow zones also expires upon approval of a watershed analysis. WAC 222-22-100(2)(b). Moreover, forest practices that would otherwise fall into Class IV and thus be subject to SEPA review become exempt from SEPA review, once a watershed analysis is approved—so long as the applicant follows the prescriptions in the analysis or an alternate prescription that the applicant can show meets or exceeds the protections provided by the other prescriptions. But if DNR determines, through voluntary monitoring processes or otherwise, that the prescriptions are not providing for the protection and recovery of the resources over a period of three years, the watershed analysis must be repeated and revised and forest practices may be conditioned pending completion of the revision. WAC 222-22-090(4).

DNR must approve the draft watershed analysis unless it finds the assessment team failed to follow the approved methodology, the team could not reasonably have come to the conclusion it did in the analysis, or the prescriptions will not accomplish their purposes. WAC 222-22-080(3).

Before the watershed analysis rules were adopted, SEPA was applied and an EIS was prepared. The rules were viewed as beneficial in that they were designed to address cumulative effects and encourage watershed planning to reduce future damage from forest practices. ALPS has not challenged the validity of the rules or the adequacy of the environmental documents supporting the rule adoption.

## FACTS

In 1993, Plum Creek Timber Company commenced a watershed analysis for a geographical area in Eastern Washington north of Cle Elum, known as the Alps Watershed administrative unit. It delivered the analysis to DNR in May 1995, along with a SEPA checklist. The analysis was conducted in accord with the methodology set forth in the board manual by scientists, managers and analysts who were qualified in accord with WAC 222-22-030. The analy-

sis contains a number of prescriptions prohibiting road building or timber harvest in certain areas of resource sensitivity and alternative prescriptions allowing such activity if a geotechnical expert concludes that the activity could be accomplished without increasing the risk of mass wasting or surface erosion. Together, these prescriptions are referred to by the parties as the "geotech" prescriptions. After circulating the watershed analysis for review and comment as required under the watershed rules, DNR ultimately issued a modified determination of nonsignificance. One of the modifications required DNR's concurrence and approval to any alternate prescriptions developed by Plum Creek's geotechnical expert.

Although future forest practices in the watershed analysis unit are concededly likely, neither the watershed analysis nor the SEPA checklist describe specific future forest practices proposed for the watershed unit. In response to criticism from ALPS during the SEPA comments about this omission, DNR stated in its modified determination of nonsignificance:

> A criticism raised in the SEPA comments centers around the assertion that likely future specific actions in the watershed are not described in the document and therefore environmental impacts of the analysis cannot be assessed. However, this implies that the Alps Watershed Analysis is, in effect, a "plan" which sets forth future projects which would otherwise not occur without the analysis. As stated above, this is not the case. The Watershed Analysis, when adopted, becomes a regulatory tool enabling the DNR to enforce restrictions on forest practice activities for the next 5 years. These restrictions are based on watershed processes and vulnerabilities and go beyond standard Forest Practices rules.

DNR issued its determination of nonsignificance and approved the watershed analysis. ALPS appealed to the FPAB, which ultimately ruled on summary judgment that ALPS presented no evidence to show that the approval of the watershed analysis and selection of prescriptions, in and of themselves, would have a probable significant ad-

verse environmental impact. The FPAB reasoned that there is no greater impact on the environment from the adoption of a watershed analysis and its prescriptions, which, by law, provide higher levels of protection to the environment than the standard rules, compared to the former process which used SEPA review and conditions developed from that review, so that SEPA review and watershed analysis procedures and processes are simply two different means to reach the same end. Thus, the FPAB concluded that none of the factual evidence challenging the sufficiency of the prescriptions presented by ALPS was material in that SEPA did not require DNR to consider future, unproposed forest practices in the course of its review of the watershed analysis. The FPAB also rejected ALPS' contentions that the geotech prescriptions violated the watershed analysis rules because (1) they did not meet or exceed the protection provided by the other prescriptions in the watershed analysis for the same sensitive areas, and (2) they failed to adequately address cumulative impacts. Accordingly, the FPAB affirmed DNR's determination that no EIS was necessary. ALPS then petitioned for judicial review.

The King County Superior Court reversed the FPAB in part, concluding that although the FPAB's determination that the geotech prescriptions met or exceeded the protection provided by the other prescriptions in the watershed analysis for the same sensitive areas was supported by substantial evidence and would be affirmed, DNR's determination of nonsignificance was incorrect because future forest practices having a significant adverse impact on the environment will likely take place in the watershed. Because approval of a watershed analysis significantly limits meaningful environmental review in the future, the court concluded that an EIS is required. The court reasoned that because future SEPA review of individual forest practices is foreclosed by the adoption of a watershed analysis with respect to impacts on fish, water and public capital improvements, full SEPA review must occur at the time the analysis itself is considered for approval. The court also

ruled that the geotech prescriptions were legally inadequate because they failed to explicitly require consideration of cumulative impacts. Accordingly, the court instructed the FPAB to remand the matter to DNR for (1) issuance of a determination of significance and disapproval of the Alps Watershed Analysis pending completion of an EIS; and (2) revision of each of the geotech prescriptions to explicitly require consideration of cumulative impacts in developing any alternative to a no-action prescription.

The superior court also awarded attorney fees and costs to ALPS under the equal access to justice act, RCW 4.84.340-.360. In so ruling, the court concluded that ALPS is a qualified party under the act, that DNR is an agency under the act, and that ALPS should be awarded attorney fees and expenses incurred both at the administrative level and the judicial review level because DNR's action at issue was not substantially justified and circumstances do not make an award of attorney fees and expenses against it unjust. This appeal by Plum Creek, DNR, DOE and FPB followed.

## DECISION

### 1. STANDARD OF REVIEW

 Threshold decisions that an EIS is not required generally are reviewed under the "clearly erroneous" standard. *King County v. King County Boundary Review Bd.*, 122 Wn.2d 648, 661, 860 P.2d 1024 (1993); *Norway Hill Preservation & Protection Ass'n v. King County Council*, 87 Wn.2d 267, 273-76, 552 P.2d 674 (1976). Appeals from FPAB decisions are governed by the Administrative Procedure Act (APA). RCW 76.09.230(5). Under the APA, the court may grant relief from an agency order if the agency has erroneously interpreted or applied the law. RCW 34.05.570. The APA does not expressly authorize summary judgments, but case law has established that agencies may employ summary proceedings. *Eastlake Community Council v. City of Seattle*, 64 Wn. App. 273, 276, 823 P.2d 1132

(1992). The FPAB's regulations allow for motions for summary judgment in accordance with CR 56. WAC 223-08--148(1). Thus, we must overlay the standard of review prescribed by the APA with the summary judgment standard of viewing disputed facts in the light most favorable to the nonmoving party while considering whether the moving party is entitled to judgment as a matter of law if based on undisputed facts. Reviewing courts nevertheless give substantial weight and deference to an agency's interpretation of the statutes and regulations it administers, and the agency's interpretation should be upheld if it reflects a plausible construction of the language of the statute and is not contrary to legislative intent. *Seatoma Convalescent Ctr. v. Department of Soc. & Health Servs.*, 82 Wn. App. 495, 518, 919 P.2d 602 (1996), *review denied*, 130 Wn.2d 1023 (1997). We review administrative decisions directly, based on the record before the administrative agency. *Macey v. Department of Employment Sec.*, 110 Wn.2d 308, 311, 752 P.2d 372 (1988).

## 2. WATERSHED ANALYSIS RULES AND SEPA

SEPA requires preparation of an EIS for any major action significantly affecting the quality of the environment. RCW 43.21C.030. Not every action requires an EIS, but proposals for legislation and other major actions having a probable significant, adverse environmental impact require an EIS. RCW 43.21C.031. There is no dispute that SEPA and the watershed analysis regulations interplay; indeed, DNR concedes that its approval of a watershed analysis is reviewed under SEPA. It did conduct a threshold SEPA analysis in this case. The agency appellants and Plum Creek argue that DNR was not required to order a full EIS for the watershed analysis here at issue because approval of the analysis could not have a significant adverse environmental impact—instead it provides the agency with another and better regulatory tool than it would have had under SEPA alone, which tool it can utilize at such time as Plum Creek may propose specific forest practices in the analysis unit in the future. Put another way, the appellants

argue that because there are no specific forest practices presently "on the table" with respect to the Alps watershed, because the watershed analysis rules do not require that such specific proposed future practices be included in a watershed analysis, and because Plum Creek does not need a watershed analysis in order to conduct forest practices in the Alps watershed in any event but could utilize standard forest practice rules and normal one-application-at-a-time SEPA procedures instead, there simply cannot be any probable significant adverse environmental impact by approval of the watershed analysis and selection of the prescriptions themselves—because by law, the prescriptions must provide greater protection to the environment than do the standard rules. In sum, the agency appellants and Plum Creek argue, as they did before the FPAB, that SEPA and the watershed analysis rules are the functional equivalent of each other—two different means to reach the same end—but the watershed analysis rules are better than the former process of SEPA review because under the new rules timber companies and state agencies can plan not creek-by-creek and river-by-river but rather as nature designed things by—watershed.

■ We do not question the value of planning by watershed. But as ALPS contends, even proposals intended to protect or improve the environment may require an EIS. SEPA regulations do not allow threshold determinations to be made by balancing the potential "good/bad" effects of a proposal. WAC 197-11-330(5). Moreover, the fact that an action will not cause an immediate land use change or the fact that there is no specific proposal "on the table" does not automatically mean that no EIS is required. "The absence of specific development plans should not be conclusive of whether an adverse environmental impact is likely." *King County v. Boundary Review Bd.*, 122 Wn.2d at 663. "The categorical approach can lead to results contrary to the purposes of SEPA. One of SEPA's purposes is to provide consideration of environmental factors at the earliest possible stage to allow decisions to be based on complete

disclosure of environmental consequences." *Id.* (citations omitted). An EIS should be prepared where the responsible agency determines that significant adverse environmental impacts are probable following the government action, even if there are no existing specific proposals to develop the land in question or because there are no immediate land use changes that will flow from the proposed action. *Id.* at 664.

■ ■ In the instant matter, there is little if any question that Plum Creek will make application for forest practices in the Alps watershed in the future—the analysis so indicates and it is unlikely that Plum Creek would have gone to the expense of performing the analysis if it did not so intend. Indeed, the very purpose of a watershed analysis is to streamline the future forest-practice permitting process. Upon approval of a watershed analysis, Class IV forest practices that would otherwise require threshold SEPA review to determine whether an EIS must be prepared are effectively reduced to the level of Class III practices and are categorically exempted from SEPA review—by virtue of the approval of the watershed analysis. Notwithstanding the deference we owe to the agencies' interpretation of the statutes and regulations they administer, it begs reason to conclude that Class IV forest practices that would otherwise require threshold SEPA analysis to determine whether an EIS must be prepared can be ignored in the process of threshold SEPA analysis leading to the approval of a watershed analysis by which those same practices will become categorically exempted from SEPA. This is not a plausible construction of the statutes and regulations here at issue. Although actions that are validly placed within categories that are exempt from SEPA are not subject to threshold review under *Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 363-65, 932 P.2d 158 (1997), courts may still determine whether a specific proposed action actually fits within the particular categorical exemption. The determination of whether approval of a particular watershed analysis requires an EIS is not the kind of action that is categorically exempt from

threshold analysis even though final approval may lead to the exemption of forest practices that otherwise would require threshold analysis.

 Plum Creek and the agency appellants take the fallback position that regardless of the FPAB's stated basis for its ruling, the Alps Watershed Analysis and DNR *did* consider these future forest practices and the prescriptions contained therein *are* adequate to avoid or minimize any adverse environmental effects of future forest practices. Those are factual issues, however; as such they are for the FPAB to consider in light of its expertise, and not for this court at this stage. We do agree with the agency appellants and DNR that the proper remand is to the FPAB for a fact-finding hearing, and not a court order requiring an EIS. Taking the FPAB's orders at face value, it appears that the Board concluded that factual evidence presented by ALPS did not raise a genuine issue of material fact *because* the Board believed it unnecessary to consider future forest practices at all. We thus decline Plum Creek's invitation to pore over the factual evidence—a task better left to the FPAB in light of its expertise after taking those practices into account.

In sum, the FPAB erred in determining ALPS' appeal by summary judgment but the superior court erred in determining as a matter of law that an EIS is required. That issue must be determined by the FPAB following remand and a fact-finding hearing.

3. GEOTECH PRESCRIPTIONS

 The challenged prescriptions contain a provision allowing a significant proposed activity within a sensitive area if it can be demonstrated to the satisfaction of a qualified geotechnical expert (who may be an employee or agent of Plum Creek supervising a forest practice) that the proposed activity would not increase the risk of ill effect. In its modified determination of nonsignificance, DNR added that before approval of the alternative prescriptions, DNR must give its concurrence and approval as well. ALPS claim these prescriptions violate a requirement of the watershed

rules that analyses explicitly state that experts must take into account cumulative effects of forest practices in developing alternate prescriptions. The purpose of the entire watershed analysis process, including the process for alternate prescriptions, is to address the cumulative effects of forest practices on public resources of fish, water and capital improvements. WAC 222-22-010(1). We agree with the FPAB that the geotech prescriptions here at issue do exactly that, in language that is entirely consistent with the purposes of the regulatory scheme. Although we see no particular harm from the superior court's order that the geotech prescriptions be revised to make even more clear that which seems already crystal clear, we observe that Plum Creek stipulated of record, in light of the challenge, that its geotechnical expert's approach would be consistent with the cumulative effects approach demanded by the regulatory scheme. The requirement for DNR's concurrence and approval of any such alternative plans should ensure that result, as well. Thus we see no need for judicial micromanagement of the wording of the geotechs. We therefore reverse the superior court in this regard, and affirm the ruling of the FPAB that the prescriptions as modified by DNR do not violate the purposes of the watershed analysis rules.

## 4. ATTORNEY FEES

DNR contends that the superior court improperly awarded attorney fees to ALPS under the equal access to justice act, RCW 4.84.340-.360. Under the act, only certain "qualified" parties are eligible for fees but there is no dispute that ALPS is a qualified party. The act grants attorney fees and costs, capped at $25,000, to the prevailing party in a judicial review of an agency action, unless the court finds that the agency action was substantially justified or the circumstances make an award unjust. RCW 4.84.350(1). DNR argues that its action was substantially justified even if ultimately incorrect and that the trial court erred, in any event, in awarding fees incurred both at the administrative and judicial level.

 There is no Washington precedent on the meaning of "substantially justified." But the state act is patterned after the federal act, under which substantially justified has been held to mean justified in substance or in the main—in other words, justified to a degree that could satisfy a reasonable person. *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988). We find this definition persuasive, and adopt it. We likewise adopt the federal standard of review, which is abuse of discretion. *Id.*

We find no abuse of discretion in the superior court's determination that DNR's position was not substantially justified. Indeed, we ourselves have determined that DNR's position that future forest practices need not be considered during threshold review begs reason.

 But we agree with DNR that fees incurred at the administrative level are ordinarily not available under the state act. Again, this is a question of first impression in Washington. Under our statute, fees are available to a qualified party that prevails in a *judicial review* of an administrative action. The statute is silent as to fees incurred at the administrative level. The clear implication is that our Legislature did not intend to make fees incurred at the administrative level available under the act.[1] Accordingly, we reverse the award of fees and expenses incurred at the administrative level.

## CONCLUSION

Although we have affirmed the superior court's rulings in

---

[1] Case law construing the federal act indicates that there may be exceptions to the general rule that fees incurred at the administrative level are not available. *See Sullivan v. Hudson*, 490 U.S. 877, 109 S. Ct. 2248, 104 L. Ed. 2d 941 (1989); *Melkonyan v. Sullivan*, 501 U.S. 89, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991) (fees may be recoverable where court retains continuing jurisdiction over a case pending agency decision that would determine appellant's entitlement to benefits; some agency proceedings may be so intimately connected with judicial proceedings as to be considered part of the civil action for purposes of a fee award). ALPS makes no serious argument that it is entitled to the benefit of any exceptions to the general rule. Thus we need not determine whether there are any similar exceptions under Washington law.

part, we have reversed the remedy on remand to the FPAB and we have reversed the revisions to the geotech prescriptions that were ordered by the superior court. ALPS remains the prevailing party with respect to the scope of the threshold review under SEPA—certainly the primary issue on appeal. The superior court awarded ALPS $7500 and expenses of $1149.74 for the judicial review, noting that ALPS had an agreement with its attorney that its attorney fees for work done in the superior court would not exceed $7500. This entire amount may or may not still be appropriate, in light of our partial reversal of the superior court's rulings. Accordingly, we remand to the superior court for its consideration of any motion DNR may wish to bring for reconsideration of the amount of fees awarded for the judicial proceedings. And we reverse the award for fees and expenses incurred at the administrative level.

 We also award attorney fees on appeal to ALPS in such reasonable sum as shall be awarded by the trial court in light of our partial reversal and partial affirmance of the superior court's rulings, the total fees for judicial review and the trial and appellate court levels not to exceed the statutory cap of $25,000. In so ruling, we reject DNR's contention in its motion for reconsideration of our opinion that to award fees for the judicial review is premature because we have "merely" remanded to the FPAB for further review. By the plain language of RCW 4.84.350(1) a qualified party that prevails in a judicial review of an agency action may be awarded reasonable attorney fees, and a qualified party shall be considered to have prevailed if it obtained relief on a significant issue that achieves some benefit that the qualified party sought. RCW 4.84.340(4) defines judicial review to mean a judicial review as defined by chapter 34.05 RCW. ALPS sought an evidentiary hearing before the FPAB but the FPAB ruled on summary judgment that ALPS was not entitled to an evidentiary hearing. We have reversed that ruling and required the evidentiary hearing. Whether or not ALPS ultimately prevails in its position that an EIS is required begs the question of

whether it prevailed at the judicial review on the question of whether such an evidentiary hearing was required in this case.

With respect to the SEPA threshold issues, we reverse the FPAB's grant of summary judgment to Plum Creek and the agency appellants, reverse the superior court's ruling requiring an EIS, and remand to FPAB for a hearing on the merits of those portions of ALPS' contentions on appeal that have survived judicial review.

BAKER and BECKER, JJ., concur.

Respondent's motion for reconsideration granted, opinion modified, and appellants' motion for reconsideration denied August 24, 2000.