232 P.3d 1154 (2010)
CHUCKANUT CONSERVANCY, North Cascades Conservation Council, and on behalf of Individual Members thereof as taxpayers of Whatcom and Skagit Counties and the State of Washington, Respondents,
v.
WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, acting through William Wallace, Northwest Regional Manager, and other officials, Petitioners, and
Skagit County, a municipal corporation of the State of Washington, American Forest Resource Council and Carpenters Industrial Council, and Skagit County, a municipal corporation of the State of Washington, Petitioners-Intervenors,
Conservation Northwest, Respondent-Intervenor.
Nos. 62707-4-I, 62780-5-I, 62781-3-I.
Court of Appeals of Washington, Division 1.
May 24, 2010.
*1156 Christa L. Thompson, Martha Ffrost Wehling, Olympia, WA, for Petitioners.
David Alan Bricklin, Bricklin & Newman, LLP, Jennifer A. Dold, Toby Thaler, Seattle, WA, for Respondents.
A.O. Denny, Skagit County Prosecutor's Office, Mount Vernon, WA, Elaine Louise Spencer, Graham & Dunn PC, David Scott Mann, Gendler & Mann LLP, Seattle, WA, for other interested parties.
ELLINGTON, J.
¶ 1 This case concerns the future of Blanchard Forest, a 4,827-acre area held in trust by the State since the 1930s. For decades the land has produced a timber harvest. At issue here is a set of proposed management "strategies" that would set aside part of the forest for recreational and environmental purposes. The plan cannot be finally implemented unless the legislature appropriates funds to compensate the trust beneficiaries for the lost timber income.
¶ 2 The Department of Natural Resources issued a determination of nonsignificance for the proposal, which is challenged by several environmental groups. The superior court rejected the determination and ordered an environmental impact statement.
¶ 3 If funded by the legislature, the plan will change the management of the land by reducing the areas subject to commercial timber harvest by one-third. The fact the plan does not eliminate logging entirely does not make it a major action with significant adverse effects upon the quality of the environment. We therefore reverse.

BACKGROUND
¶ 4 Blanchard Forest is one of the treasures of the Pacific Northwest. It sits atop the southeastern peak of the Chuckanut Range, a 4,827-acre area of land that lies west of Interstate 5 and south of Bellingham and Larabee State Park.
¶ 5 Only in Blanchard Forest do the Cascade foothills come down to the sea. The Forest rises 2,000 feet above Puget Sound. Within it are two lakes, metamorphic cliffs and talus caves, five creeks, and a variety of freshwater ponds and wetlands. The Forest has a high diversity of fish, wildlife, and invertebrates, and is home to several endangered species, including the Townsend's big-eared bat and the marbled murrelet, a marine bird that roosts in old, upland forests whose habitat has been severely restricted due to the logging of old growth stands.
¶ 6 Close to a major urban area, Blanchard Forest receives 30,000 to 50,000 visitors every year, and their number is expected to increase with the growing populations in Skagit and Whatcom Counties. Visitors come to enjoy hiking and camping at Lily and Lizard Lakes, hang gliding at Samish Overlook, rock climbing at the Oyster Dome, and panoramic vistas of Puget Sound, the San Juan Islands, and the Olympic mountains, all accessible by a system of about 20 miles of intricate, high quality trails.
¶ 7 These recreational uses coexist with foresting activities. During the first three decades of the twentieth century, Blanchard Forest was logged almost entirely and only a *1157 small amount of old growth was spared.[1] In the early 1930s, the land was transferred to the State Forest Board in trust, to be managed for the benefit of the local taxing districts for which the land had been the revenue base. The land was reforested, and in the early 1970s, the Department of Natural Resources (DNR) began to harvest second growth stands. Approximately 36 percent of the Blanchard block was harvested and regenerated in the third rotation between 1982 and 1992. Between 1992 and 2002, DNR harvested an average of 1.7 million board feet annually. As of 2002, the third generation was ready for harvest and DNR anticipated harvesting approximately 4 million board feet annually in three to four units ranging from 25 to 40 acres each.
¶ 8 Attempts have been made to take Blanchard Forest land out of timber production and devote it to recreational and ecological uses, including a 1992 proposal by Habitat Watch to set aside 2,200 acres as a natural resources conservation area.[2]
¶ 9 The present case involves another such effort. In 2006, with sizeable acreage ready for harvest, DNR sought to balance its legal obligations with community interests. DNR convened a stakeholder group called the Blanchard Forest Strategies Group, with 10 members representing various interests including recreation, conservation, and the timber industry. Over eight months, the group held 12 public meetings, considered the existing data and previous assessments, and reached a consensus recommendation for management of the Forest. This recommendation is known as the Blanchard Forest Strategies (the Strategies).
¶ 10 The Strategies propose to divide Blanchard Forest into four management zones: a core zone for conservation and recreation, a zone consisting of scattered areas to be managed for habitat conservation, a zone to be logged but subject to mitigation of visual impact, and a general management zone to be managed for revenue production. Because the plan calls for eliminating the timber harvest in the core zone (approximately one-third of the forest), the plan requires legislative appropriation of funds to compensate the trust beneficiaries for the lost revenue stream. The necessary compensation amounts to some $12 million, of which the legislature has thus far appropriated $4 million.
¶ 11 The core zone is an area of approximately 1,600 acres in the upper elevations. It includes the old growth stands that are habitat for the marbled murrelet. It also includes a significant majority of the recreational opportunities offered by the forest. The zone is to be "managed in a manner similar to a permanently protected [n]atural [r]esource [c]onservation [a]rea with emphasis on wildlife habitat, older forest conditions, vistas, and maintenance of forest ecosystem health; while allowing non-motorized, low impact recreation such as horseback riding, hiking, mountain biking, and hang gliding."[3] The only foresting will be "ecological management," and timber revenue will be "a by-product, not an objective, of ecological management inside of the core."[4] Where possible, ecological management will be conducted without roads; any necessary roads will be of minimum length, constructed with minimal impacts, and temporary.
¶ 12 The habitat conservation plan zone will be managed "consistent with the goals, objectives, and conditions of [DNR's 1997 Habitat Conservation Plan] regarding ecologically sensitive areas and protected species and habitat requirements."[5]
*1158 ¶ 13 In the high visual sensitivity zone, logging activities will be subject to visual impact mitigation pursuant to DNR's Policy for Sustainable Forests (Dec.2006).[6]
¶ 14 The general management zone will be managed as it is presently, for revenue production. To support the harvest, DNR will develop a road system exclusively outside the core zone.
¶ 15 The Strategies call for a recreational overlay applicable to all management zones, for trails and other recreational uses. A working forest overlay also will be developed, emphasizing natural resource stewardship.
¶ 16 The Strategies provide for a five-year implementation phase, during which the legislature will be asked to appropriate funds to compensate for lost timber revenue. During this period, DNR will confine the timber harvest to areas outside the core zone. Until compensation is secured, the general management and the high visual sensitivity zones will be subject to intensified logging.
¶ 17 Finally, the Strategies will change no existing regulations, policies or plans. New projects will be subject to environmental review as before.
¶ 18 As required by the State Environmental Policy Act, chapter 43.21C RCW (SEPA), DNR reviewed the Strategies for potential environmental impacts. Reasoning that the Strategies are a nonproject action[7] outlining management objectives to be implemented under existing rules and policies and therefore generate no environmental impacts by themselves, DNR issued a determination of nonsignificance.
¶ 19 Chuckanut Conservancy and North Cascades Conservation Council (Chuckanut) filed this action challenging the Strategies on two grounds: SEPA compliance and violation of the public lands act, Title 79 RCW. Conservation Northwest, the American Forest Resource Council, the Carpenters Industrial Council, and Skagit County intervened as defendants.
¶ 20 In considering the SEPA challenge, the trial court focused upon two issues: the "baseline" against which to evaluate the Strategies' environmental impacts and the level of analysis required to assess those impacts. The court accepted that some logging may be required in the interest of the trust beneficiaries, but focused upon the requirement that the land be managed for multiple uses, and concluded, "I cannot say that the baseline against which environmental impacts are to be measured is inevitably logging."[8] The court also held the environmental impact statements prepared for adoption of state- and region-wide statutes, rules and policies are too general for assessment of environmental impacts of the Strategies on Blanchard Forest. The court ordered an environmental impact statement.[9]
¶ 21 DNR, American Forest Resource Council, Carpenters Industrial Council and Skagit County petitioned for discretionary review. The trial court certified that its order is dispositive on a controlling issue of law. We granted discretionary review.

ANALYSIS
¶ 22 SEPA is a legislative pronouncement of our state's environmental policy.[10] It recognizes "the necessary harmony between humans and the environment in order to prevent and eliminate damage to the environment *1159 and biosphere, as well as to promote the welfare of humans and the understanding of our ecological systems."[11] SEPA does not demand a particular substantive result in government decision-making. Rather, it requires that "`environmental amenities and values will be given appropriate consideration in decision making along with economic and technical considerations.'"[12] To this effect, SEPA requires the preparation of an environmental impact statement (EIS) for any "major actions significantly affecting the quality of the environment."[13] Declining to define "significantly affecting," our Supreme Court has held that "the procedural requirements of SEPA, which are merely designed to provide full environmental information, should be invoked whenever more than a moderate effect on the quality of the environment is a reasonable probability."[14]
¶ 23 Under SEPA, evaluation of a proposal's environmental impact requires examination of at least two relevant factors: "`(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.'"[15] Where a proposal "change[s] neither the actual current uses to which the land was put nor the impact of continued use on the surrounding environment,"[16] that action is not a major action significantly affecting the environment and an EIS is not required.
¶ 24 The agency conducts a threshold process to decide whether an action qualifies as a major action significantly affecting the quality of the environment.[17] The agency considers mitigation measures the applicant will implement and any such measures required by regulations, comprehensive plans, or other existing environmental rules or laws.[18] If all or part of the proposal or impacts have been analyzed in a previously prepared environmental document, that analysis can be adopted or incorporated by reference.[19]
¶ 25 At the end of the threshold phase, the agency issues one of three determinations: nonsignificance (DNS), a mitigated determination of nonsignificance (MDNS) (if the proposal will not have probable significant environmental impacts or if those impacts will be mitigated),[20] or a determination of significance (DS). An EIS is mandatory following a DS.[21]
¶ 26 Standard of Review. We review the agency action, not the decision of the superior court.[22] A threshold determination that an EIS is not required is reviewed under the "clearly erroneous" standard.[23] A *1160 court will overturn a DNS only when "`the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"[24] The scope of review is broad and the search for significant environment impacts must be considered in light of the public policy of SEPA.[25]
¶ 27 The agency's threshold determination is entitled to judicial deference,[26] but the agency must make a showing that "environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA."[27]
¶ 28 The StrategiesEnvironmental Impacts. It is undisputed that the core zone, the habitat conservation plan zones and the recreational and working forest overlays will create environmental benefits. The contentious component of the Strategies is the plan to continue logging in the general management and high visual sensitivity zones.
¶ 29 We must begin with a brief discussion of the governing laws. The State owns and manages 2.1 million acres of forest land, of which approximately 1.5 million were granted by the federal government when Washington joined the Union in 1889. The federal grant lands are held and managed by the State in trust for the benefit of the public institutions identified in the federal Enabling Act of 1889 (e.g., common schools, the University of Washington).[28] The State has the same fiduciary duties toward the beneficiaries as would a private trustee.[29]
¶ 30 The second largest category of state forest lands, approximately 600,000 acres, consists of land deeded by counties to the State after tax foreclosures, mostly at the beginning of the twentieth century. This is known as forest board transfer land, of which Blanchard Forest is one example. Forest board transfer lands also are "held in trust," administered and protected in the same manner as other state forest lands.[30] The tax districts where the lands are located receive the proceeds from the State's management of these lands.[31]
¶ 31 In 1957, the legislature created DNR and assigned to it the management of state forest lands. As trustee, DNR must produce revenue for trust beneficiaries, preserve productivity, and protect the land.[32] Revenue is generated primarily by selling harvested timber.[33] State lands primarily valuable for forest crops must be managed on a sustained yield basis.[34]
¶ 32 Where compatible with the best interests of the State, the welfare of the citizens, and the applicable legal framework, public lands must be administered and managed for "multiple use."[35] In the case of trust lands, multiple uses are those additional to and compatible with the financial obligations to the beneficiaries and may include recreational areas, hunting and fishing, recreational trails, and so on.[36] Additional uses not compatible with the financial obligations of trust *1161 management "may be permitted only if there is compensation from such uses satisfying the financial obligations."[37]
¶ 33 DNR is also authorized to withdraw limited acreage of public lands from certain uses "[f]or the purpose of providing increased continuity in the management of public lands and of facilitating long range planning by interested agencies."[38] This authority does not, however, modify DNR's fiduciary duties as to granted trust lands. The State is still obliged to "manage the land under its jurisdiction in the best interests of the beneficiaries of granted trust lands."[39]
¶ 34 DNR's duties as to trust lands are unambiguous and unavoidable. In Skamania County v. State,[40] the Washington Supreme Court confirmed that DNR must act prudently and with undivided loyalty to the trust beneficiaries, to the exclusion of all other interests no matter how laudable.
¶ 35 Under the statutory regime described above, state forest lands, including Blanchard Forest, must be logged on a sustainable basis unless there is compensation to the trust beneficiaries for lost revenue.
¶ 36 Chuckanut recognizes the trust status of the Blanchard Forest. It emphasizes, however, that DNR has a duty to manage state lands for multiple uses, has authority to withdraw state lands from their existing uses, and has authority to protect trust lands from logging "as long as the trust is compensated."[41] Chuckanut contends that DNR's decision to protect the core zone from logging demonstrates that all of the Blanchard Forest need not be logged, and that the Strategies' environmental impacts must be evaluated against a "no logging" use: "If DNR could set aside 1,600 acres, why not more?"[42]
¶ 37 Leaving Blanchard Forest in a pristine state is a laudable goal with widespread support. But Chuckanut forgets that as trustee, DNR can cease harvesting timber only if the trust is compensated. DNR has no power to preserve the entire forest. Only the legislature can do that.
¶ 38 Chuckanut offers no solution to DNR's dilemma. There is no guarantee the legislature will appropriate the remainder of the $12 million required to implement the Strategies and protect the two zones they would exempt from logging. It would require $36 million to protect the entire forest. Whether to commit state funds to this purpose is a political judgment, not a SEPA review issue.
¶ 39 It is therefore the proposal at hand that must be assessed in the threshold SEPA phase.[43] The agency's task is to analyze the proposal's impacts against existing uses, not theoretical uses.[44]
¶ 40 In its determination of nonsignificance, DNR considered the entire regulatory and policy system governing forestry on state lands. This framework both guides policy decisions and prescribes operational details. Some aspects are briefly described here.
¶ 41 Foremost is the Forest Practices Act of 1974, chapter 76.09 RCW, which is designed to manage and protect the state's natural resources and ensure a viable commercial timber industry.[45] The act creates four classes of forest practices based on their potential for damaging public resources. Classes I through III are exempt from environmental review.[46] Class IV practices have potential for substantial impact on the environment and require DNR to evaluate *1162 whether an EIS must be prepared.[47] The forest practices board (FPB) has authority to promulgate rules establishing what forest practices comprise each class.[48] Class IV-special practices automatically require an EIS.[49] For Class IV-general, DNR must decide on a case-by-case basis whether the practice requires an EIS.[50] Forest practices rules spell out detailed prescriptions for a broad range of practices, including timber harvesting, road construction and maintenance, and reforestation. In 1992, the FPB amended the Class IV-special list and added prescriptions governing watershed analysis, wetland protection, wildlife reserve tree management, clear cut size and timing, and use of forest chemicals.
¶ 42 The forest and fish rules, adopted in 2001, focus on water quality, salmon habitat and other aquatic and riparian resources.[51] They place forest practices on potentially unstable slopes into the Class IV-special category and tighten the rules for road construction and maintenance.
¶ 43 In 2006, DNR negotiated a forest practices habitat conservation plan with federal agencies under the Endangered Species Act.[52]
¶ 44 The 1997 Habitat Conservation Plan addresses DNR's compliance with the Endangered Species Act. Among the species covered is the marbled murrelet. A key component is riparian management zones on all salmonid-bearing streams and along many small nonfish-bearing streams.
¶ 45 DNR's Policy for Sustainable Forests guides the management and stewardship of state forest trust lands and addresses economic performance, forest ecosystem health and productivity, and social and cultural benefits. To ensure sustainability of the forests, the policy limits the range of permissible changes in annual harvest levels. The policy also defers harvest of old growth timber (stands five acres and larger that originated naturally, before the year 1850).
¶ 46 DNR points out that under this framework, individual logging projects are subject to SEPA review. Chuckanut objects that SEPA review for individual proposals will not protect the forest because historically, DNR has conducted only Class I through III forest practices, which are exempt from an EIS. Chuckanut believes DNR wishes to evade environmental review, particularly any analysis of cumulative impacts. Even if this were so, it is not a matter affected by the Strategies, which have no bearing on DNR's choice of future forest practices.
¶ 47 These statutes, rules and policies have been subjected to intense environmental review. The corresponding EISs comprise most of the 10,000-page record in this appeal. Chuckanut asserts that the EISs are too large in scale and too general in scope to provide useful analysis of a particular landscape. DNR responds that, based on a series of key indicators of potential sensitivity, the two watersheds included in Blanchard Forest are unremarkable when compared to other DNR-managed trust lands, and there is no reason to expect that logging on Blanchard Forest would have impacts outside the norm relative to all the lands analyzed in the EISs. Chuckanut contends that compliance with the existing regulatory framework does not guarantee an absence of significant impacts resulting from the Strategies.
¶ 48 But Chuckanut does not clarify what adverse impacts may result from the Strategies. Chuckanut's true argument is that the Strategies do not eliminate all environmentally adverse impacts on the forest, because logging will continue in the zones not exempt. Given that the Strategies make no changes to existing uses except to preserve some tracts *1163 from harvest, DNR did not improperly rely on the existing regulatory and policy framework and the corresponding EISs in its threshold review.
¶ 49 Threshold determinations do not examine alternatives, and Chuckanut contends DNR should conduct an EIS in order to consider alternatives to the Strategies. Even if this were a viable argument, the only alternative identified by Chuckanut is cessation of logging. As discussed above, that alternative is not available to DNR.
¶ 50 Blanchard Forest is trust land and has been logged on a sustainable basis for decades. It is against this existing use that the Strategies' environmental impacts must be evaluated. For two-thirds of the forest, the Strategies will have no impact at all; current uses will continue and new projects will continue to receive environmental review as before. For the other one-third, logging will cease altogether.[53] DNR did not clearly err in determining that the Strategies themselves are not a major action significantly affecting the environment and do not require an EIS.
¶ 51 Reversed.
WE CONCUR: SCHINDLER and COX, JJ.
NOTES
[1] Two percent of Blanchard Forest (approximately 100 acres) is covered by stands greater than 100 years old, of which 48 acres is approximately 300 years old.
[2] DNR commissioned an evaluation for either a natural resources conservation area or a natural preserve area. The evaluation concluded that, although locally important, the area is a "low priority for conservation." DNR Record (REC) at 3588.
[3] REC at 44.
[4] REC at 47.
[5] REC at 44. There seem to be several such areas, located both inside and outside the core zone.
[6] Available at http:/ /www.dnr.wa.gov/ Publications/lm_psf_policy_sustainable_forests. pdf.
[7] A nonproject action is one which is "different or broader than a single site specific project." WAC 197-11-774.
[8] Clerk's Papers at 314. "Baseline" is a term borrowed from National Environmental Policy Act, 42 U.S.C. § 4321, jurisprudence. It is a practical tool often employed to identify the environmental consequences of a proposed agency action: "`Without establishing ... baseline conditions... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA.'" American Rivers v. F.E.R.C., 201 F.3d 1186, 1195 n. 15 (9th Cir.1999) (alterations in original) (quoting Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir.1988)).
[9] The court stayed the public lands act claim pending resolution of this appeal.
[10] Stempel v. Dep't of Water Res., 82 Wash.2d 109, 117, 508 P.2d 166 (1973).
[11] Id.
[12] Id. at 118, 508 P.2d 166 (quoting RCW 43.21C.030(2)(b)).
[13] RCW 43.21C.030(2)(c).
[14] Norway Hill Preserv. & Prot. Ass'n v. King County Council, 87 Wash.2d 267, 278, 552 P.2d 674 (1976). SEPA rules take a similar approach. See WAC 197-11-794(1), (2) ("`Significant' as used in SEPA means a reasonable likelihood of more than a moderate adverse impact on environmental quality. Significance involves context and intensity and does not lend itself to a formula or quantifiable test.... The severity of an impact should be weighed along with the likelihood of its occurrence.").
[15] Norway Hill, 87 Wash.2d at 277, 552 P.2d 674 (quoting Narrowsview Preserv. Ass'n v. Tacoma, 84 Wash.2d 416, 423, 526 P.2d 897 (1974)).
[16] ASARCO, Inc. v. Air Quality Coalition, 92 Wash.2d 685, 706, 601 P.2d 501 (1979) (emphasis omitted).
[17] WAC 197-11-310 through -335.
[18] WAC 197-11-330(1)(c).
[19] WAC 197-11-315(2).
[20] WAC 197-11-340,-350.
[21] RCW 43.21C.030(2)(c), .031; WAC 197-11-360. An EIS should analyze and compare the proposal and reasonable alternatives (including the "no-action" alternative), their probable significant environmental impacts, and reasonable mitigation measures and their effectiveness. RCW 43.21C.030(2)(c); WAC 197-11-440(5).
[22] Norway Hill, 87 Wash.2d at 276, 552 P.2d 674.
[23] Id. at 273-76, 552 P.2d 674.
[24] Norway Hill, 87 Wash.2d at 274, 552 P.2d 674 (quoting Ancheta v. Daly, 77 Wash.2d 255, 259, 461 P.2d 531 (1969)).
[25] Sisley v. San Juan County, 89 Wash.2d 78, 84, 569 P.2d 712 (1977).
[26] See RCW 43.21C.090.
[27] Juanita Bay Valley Cmty. Ass'n v. City of Kirkland, 9 Wash.App. 59, 73, 510 P.2d 1140 (1973).
[28] Enabling Act § 10, 25 Stat. ch. 180, at 676 (1889).
[29] Skamania County v. State, 102 Wash.2d 127, 133, 685 P.2d 576 (1984).
[30] RCW 79.22.040.
[31] See RCW 79.64.110.
[32] State Owned Forests v. Sutherland, 124 Wash. App. 400, 404, 101 P.3d 880 (2004) (citing RCW 43.30.215(2)).
[33] Id.
[34] RCW 79.10.320. "Sustainable yield" means "management of the forest to provide harvesting on a continuing basis without major prolonged curtailment or cessation of harvest." RCW 79.10.310. As it concerns Blanchard Forest, this involves establishing rotations by reforesting the logged areas the year following logging; logging is then performed in other areas while the reforested areas mature for logging (about 60 years).
[35] RCW 79.10.100.
[36] RCW 79.10.120.
[37] Id.
[38] RCW 79.10.210.
[39] Id.
[40] 102 Wash.2d at 135-38, 685 P.2d 576.
[41] Respondent's Br. at 42.
[42] Id. at 48.
[43] See RCW 43.21C.030(2)(c); San Juan County v. Dep't of Natural Res., 28 Wash.App. 796, 801, 626 P.2d 995 (1981).
[44] See Norway Hill, 87 Wash.2d at 278, 552 P.2d 674.
[45] Johnson Forestry Contracting, Inc. v. Dep't of Natural Res., 131 Wash.App. 13, 23, 126 P.3d 45 (2005); see also RCW 76.09.010(1).
[46] RCW 76.09.050; RCW 43.21C.037.
[47] RCW 43.21C.037.
[48] Id.; Title 222 WAC.
[49] WAC 222-16-050(1).
[50] WAC 222-16-050(2).
[51] See Wash. St. Reg. XX-XX-XXX (July 1, 2001).
[52] 16 U.S.C. § 1531. The act provides for the designation and protection of endangered species, and provides a means to conserve the ecosystems on which such species depend. Section 10 authorizes a landowner to negotiate a habitat conservation plan at a landscape level to minimize and mitigate any incidental impact to threatened and endangered species while conducting lawful activities.
[53] The trial court stated in its memorandum opinion that "implementation of the Strategies here will inevitably lead to logging of much of Blanchard Forest." Clerk's Papers at 316. We do not see how this is so. Under the existing legal framework, logging will occur whether or not the Strategies are adopted. A smaller part of the forest will be logged under the Strategies than presently. We find the two cases relied upon in the memorandum opinion unhelpful because in both, there was a certainty (or strong likelihood) that changes would result from the challenged proposals, and such changes were overlooked in the SEPA review. See King County v. Boundary Review Bd. for King County, 122 Wash.2d 648, 663, 860 P.2d 1024 (1993) (approval of annexation required EIS because development sure to follow); Alpine Lakes Protection Society v. Wash. St. Dep't of Natural Resources, 102 Wash.App. 1, 16-17, 979 P.2d 929 (1999) (approval of watershed analysis required EIS because once approved, Class IV forest practices that would otherwise require threshold SEPA review would become categorically exempted).