[No. 29077-4-II. Division Two. December 23, 2003.]

KETTLE RANGE CONSERVATION GROUP, ET AL., *Appellants*, v.
THE DEPARTMENT OF NATURAL RESOURCES,
ET AL., *Respondents*.

*Toby Thaler* and *Peter R. Goldman* (of *Washington Forest Law Center*), for appellants.

*Christine O. Gregoire, Attorney General,* and *Steven W. Reneaud, Assistant,* and *Kay M. Brown* (of the *Environmental Hearings Office*), for respondent Department of Natural Resources.

*Edwin C. Perry* (of *Tonkon Torp, L.L.P.*) (*Max M. Miller,* of counsel), for respondent Stimson Lumber Company.

HUNT, C.J. — The Kettle Range Conservation Group and the Lands Council (collectively Kettle Range) appeal two decisions of the Forest Practice Appeals Board (Board) in Kettle Range's action to require environmental regulation compliance before Stimson Lumber Company harvests timber in the LeClerc Creek watershed: (1) the Board's grant of partial summary judgment to the Washington State Department of Natural Resources (DNR), and (2) its affirmance of the DNR's approval of the LeClerc Creek Watershed Analysis (WSA) and related modified determination of nonsignificance (MDNS). Kettle Range argues that (1) the DNR failed to comply with the State Environmental Policy Act (SEPA)[1] when it erroneously issued an MDNS and failed to require an environmental impact statement (EIS) addressing the effect of Stimson Lumber Company's future forest practices on endangered species and water quality and (2) the mitigating "prescriptions," some based on erroneous calculations, do not comply with the Forest Practices Rules[2] and do not cure the adverse environmental impacts of Stimson's proposal.

Acknowledging the Ninth Circuit's recent decision in *Selkirk Conservation Alliance v. Forsgren*,[3] we hold that the record contains substantial evidence to support the Board's determination that the DNR adequately considered Stimson's future forest practices. But we agree with Kettle Range's assertion that because the road and sedimentation prescriptions are based on significant erroneous data and calculations, we cannot say that the watershed analysis and its prescriptions will cure adverse impacts of Stimson's proposal on the environment or comply with Forest Practice Rules. Accordingly, we affirm in part, reverse in part, and remand to the Board.

---

[1] Chapter 43.21C RCW.

[2] Chapter 76.09 RCW.

[3] *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944 (9th Cir. 2003).

## FACTS

### I. LeClerc Creek Watershed Analysis

Many tributaries join to form the Pend Oreille River in northeastern Washington. Among them is LeClerc Creek near Usk in Pend Oreille County. The LeClerc Creek watershed area was heavily logged in the past, resulting in significant soil erosion and stream sedimentation, especially along old logging roads.

In 1996, anticipating eventual logging of the area, Plum Creek Timber Company (Plum Creek) initiated a watershed analysis for the LeClerc Creek watershed. Plum Creek then sold its timber holdings in the LeClerc Creek watershed to Stimson Lumber Company.

Stimson completed Plum Creek's watershed analysis, using a resource team comprising six analysts[4] who analyzed the watershed processes and resources of the area. From this information, the team compiled an overview and seven "modules" addressing seven specific areas of environmental concern within the watershed: "mass wasting,"[5] surface erosion, hydrologic conditions, riparian function, stream channel assessment, fish habitat, and water supply and public works.

### A. Forest Practices Prescriptions

A "prescription"[6] team, comprising forestry managers from the Kalispel Indian Tribe, the DNR, and industry,

---

[4] The DNR sets minimum qualifications for analysts participating in watershed resource assessment. WAC 222-22-030(1). Each resource assessment team should include analysts qualified in forestry; forest hydrology; forest soil science or geology; fisheries science; and geomorphology. WAC 222-22-050(1).

[5] The primary objectives of the "mass wasting" module were to identify the geomorphic circumstances where landslides are most likely to occur, to identify and to map their locations, to identify any management practices contributing to landslides within the watershed analysis unit, and to help managers develop management prescriptions to minimize future landslide occurrences.

[6] "Prescriptions" are additional restrictions that exceed and supplement standard Forest Practices Rules on harvesting, road building, or other forest activities

used the resource team's data to draft 12 prescriptions restricting forest practices to protect sensitive resources. The four prescriptions at issue in this appeal were designed to reduce soil erosion.[7] Administrative Record (AR) at 2207-49.

Both DNR field managers from other regions and the general public reviewed the LeClerc Creek watershed analysis. Under the terms of the WSA, Stimson completed a Road Maintenance and Sediment Reduction Plan (Road Plan) to guide future compliance with the WSA prescriptions for the roads.

## B. SEPA Checklist

As required by WAC 222-22-080(5),[8] Stimson also submitted a completed SEPA checklist to the DNR for review. The checklist noted grizzly bear, woodland caribou, gray wolves, and the North American lynx as threatened or endangered species on site. The checklist did not list bull trout as a threatened or endangered species because its status was still pending.

The DNR responsible SEPA official[9] reviewed the WSA and the SEPA checklist and issued a Determination of Nonsignificance (DNS). The DNS, SEPA checklist, and an executive summary were broadly distributed[10] for review and comment. Although not on the DNR's distribution list,

---

and are designed to minimize, prevent, or avoid the likelihood of adverse change to the specific sensitive resource that is the focus of the prescription. WAC 222-22-070(1), (3).

[7] The four prescriptions are numbers 5, 6, 11, and 12. Administrative Record (AR) at 33.

[8] To ensure that WSAs comply with SEPA, WAC 222-22-080(5) requires that "[a]ll watershed analyses must be reviewed under SEPA on a nonproject basis."

[9] This designated SEPA official represents the lead agency, here, the DNR, and is responsible for ensuring adequate environmental analysis and compliance with SEPA procedural requirements. SEPA Handbook, ch.2, § 2.4, *available at* http://www.ecy.wa.gov/programs/sea/sepa/handbk/hbch02.html#TheLeadAgency (last visited Nov. 26, 2003).

[10] The distribution list included the Pend Oreille County Planning Director, the Washington State Department of Ecology, the Washington State Department of

Kettle Range sent comments on behalf of itself, the Lands Council, and the Spokane Chapter of the Washington Environmental Council. In response to comments received, the DNR modified some of the prescriptions. It then issued a modified determination of nonsignificance.[11]

After the bull trout was listed as "threatened" under the federal Endangered Species Act,[12] the DNR issued an addendum to the MDNS, stating that this new listing did not substantially change its MDNS analysis of significant environmental impacts. The DNR then issued a final SEPA determination, approving the amended LeClerc Creek WSA. Consistent with its issuance of the MDNS, the DNR did not require Stimson to prepare an EIS.

## II. SUMMARY JUDGMENT

Kettle Range Conservation Group and the Lands Council appealed to the Board.[13] Joined by Stimson, the DNR moved for partial summary judgment, arguing that the

Fish and Wildlife, the Washington Environmental Council, the Kalispel Indian Tribe, the Northwest Indian Fisheries Commission, the United States Fish and Wildlife Department, members of the timber industry, and private citizens.

[11] Comments in response to the 1997 DNS related to the riparian function module and its prescriptions. The United States Fish and Wildlife Service sent comments in 1998 concerning the water temperature in areas containing bull trout. Kettle Range's comments focused on future forest practices and their potential effects on listed species, including grizzly bear, to which DNR responded with a finding that the prescriptions would mitigate any probable significant adverse impacts (generally, with no specific mention of grizzlies), and that Stimson's forest practices proposal would not have a probable significant adverse impact on the environment. Kettle Range's letter to the DNR did not challenge the road inventory or prescription calculations.

[12] Congress enacted the Endangered Species Act in 1973 to address the impact of economic growth and development on fish, wildlife, and plants. 16 U.S.C. §§ 1531-1544 (2000 & Supp. 2003). Under 16 U.S.C. § 1532(20), "[t]he term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." " '[E]ndangered species' means any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6) (2000).

[13] Kettle Range also appealed Stimson's approved forest practice permits Nos. 3004448 and 3004464 for the LeClerc Creek Watershed, moved for an emergency stay, and then moved for a preliminary stay. The Board denied both motions.

The Board consolidated the appeals of these two permits with the prior appeal

WSA prescriptions were adequate to satisfy the Forest Practices Act of 1974, chapter 76.09 RCW, and chapter 222-22 WAC resource-protection standards. Kettle Range also sought summary judgment on the SEPA issues, arguing that the LeClerc Creek Watershed Analysis SEPA review was fatally flawed both procedurally and factually.

After clarifying the issues,[14] the Board granted the DNR's and Stimson's motions for partial summary judgment.[15] The Board determined that (1) the WSA will not have a significant adverse impact on the environment, so no EIS is required; (2) the WSA did not violate the Clean Water Act;[16] (3) the WSA need not address environmental, aesthetic, recreational, or wildlife concerns; (4) alternatives to the prescriptions are permitted; (5) neither the WSA Rules nor Forest Practice Rules require the DNR to monitor implementation of the prescriptions; and (6) the DNR need not design prescriptions for cattle-grazing activities. The Board otherwise denied the motions for summary judgment.

---

of the LeClerc Creek watershed analysis. Kettle Range then appealed permit No. 3005305, which was also consolidated with the earlier appeals.

[14] Originally there were four issues before the Board. Issues 1 and 2 were: (1) whether the WSA will have a probable significant, adverse effect on the environment, requiring an EIS; and (2) whether the DNR's threshold SEPA determination is clearly erroneous because it failed to consider specifics about the timing, scope, context, or intensity of future forest practices. The Board directed Kettle Range to clarify issues 3 and 4, which Kettle Range distilled into the following: (1) whether the WSA fails to comply with WAC 222-22-050(2) because it violates the Clean Water Act, 33 U.S.C. §§ 1251-1287, and causes degradation of water quality and fish and wildlife habitat; (2) whether the watershed analysis rules require consideration of environmental, aesthetic, recreational, or wildlife concerns; (3) whether the WSA rules permit alternatives to the prescriptions; (4) whether the WSA's failure to require monitoring of the implementation of the prescriptions violates WAC 222-22-010 and RCW 76.09.010; (5) whether prescription 10 is inadequate for failing to prescribe cattle grazing activity; and (6) whether prescription 11 is inadequate because it fails to prescribe use or replacement of a county road. AR at 1927-28.

[15] The Board's regulations allow motions for summary judgment in accordance with CR 56. WAC 223-08-148(1). We discuss summary judgment procedure as it relates to Board decisions in further detail in Analysis section II. B. *infra*.

[16] Citing this ruling, the Board precluded Kettle Range from eliciting testimony or offering evidence in support of this claim at the subsequent hearing. *See* Analysis *infra* section III.

### III. BOARD HEARING

During a hearing on the remaining issues, the parties presented additional SEPA compliance information, including: the impact of future forest practices, reduction of sediment delivery to area streams, classification of the Middle Branch Road, "rocking"[17] of Middle Branch Road, "armoring"[18] LeClerc Creek, and ways that the WSA prescriptions were or were not consistent with WAC 222-22--080(3)(b).

### A. Forest Practices

Kettle Range disputed that the DNR complied with its duty to evaluate adverse impacts under SEPA, and it specifically disagreed with the DNR's future forest practices assessment. Relying on *Alpine Lakes Protection Society v. Department of Natural Resources* (*ALPS* II), 102 Wn. App. 1, 979 P.2d 929 (1999), and *Plum Creek Timber Co. v. Washington State Forest Practices Appeals Board* (*ALPS* III), 99 Wn. App. 579, 993 P.2d 287 (2000), the Board found "sound policy reasons" for the DNR's evaluation process. *ALPS* II required the DNR to consider "future forest practices" when reviewing a WSA under SEPA, and the Board was satisfied that Stimson satisfied this burden.

First, the Board found the DNR's assumption—that eventually the entire LeClerc Creek watershed would be logged—revealed environmental consequences throughout the watershed. Second, alternatively requiring a list of specific future harvests, which would likely change in response to market conditions, might not accomplish the

---

[17] Neither the RCW nor the WAC defines the term "rock" or "rocking." It appears, however, that "rocking" is a method of surfacing or resurfacing a road in order to reduce sedimentation. The surfacing rock, of various sizes and coarseness, is spread over the road, crushed, and compacted.

[18] "Armoring" is another term that neither the RCW nor the WAC defines. Dwight Opp, Stimson's fee land manager, testified that rocks of varying sizes were placed along the stream banks to protect the surfacing rock placed on top of the road. As the term implies, "armoring" creates a shield and "minimize[s] any further entry of sediment into the creek."

same environmental purpose. Third, the DNR is supposed to consider "future forest practices as contemplated to occur" with regard to a proposed WSA. Finally, Dwight Opp, Stimson's fee land manager, testified that the intent behind completing the watershed analysis was eventually to log all the permissible land in the entire area.

The Board concluded that *ALPS* III placed the burden on Kettle Range to show how requiring SEPA review for individual forest practices would afford greater environmental protection. The Board concluded that Kettle Range had failed to satisfy this burden.

## B. Reduction of Sediment Delivery

The DNR's watershed analysis manual (Manual) noted that if there were a reduction in sediment delivery to streams to a level 50 percent above "background,"[19] there would likely be a lower chance for adverse change in the area. Nancy Sturhan, a witness for the DNR, agreed with the Manual's assumption that it is difficult to detect a change in sediment delivery below the 50 percent threshold. JoAnn Metzler, a member of the resource assessment team, also testified about the difficulty in detecting a change in sediment delivery below the 50 percent threshold.

Even Kettle Range's expert, Dr. Timothy Abbe, agreed that it would be hard to distinguish between 100 and 150 percent of background sediment delivery. The Board ultimately agreed that the "50 percent standard" was the minimum level of detectability for change to natural sedimentation conditions.

## C. Middle Branch Road Classification

The appropriate classification for Middle Branch Road was also an issue during the summary judgment hearing.

---

[19] "Background" refers to the level of sediment that would naturally occur absent any forest practices. Br. of Stimson at 37.

Stimson had rocked the Middle Branch Road in 1999. After the rocking, roughly 800 loaded logging trucks used the road, primarily during the winter months, when the ground was frozen. Wintertime hauling along frozen roads produces less sediment delivery to streams than does hauling when the roads are not frozen.

According to Manual standards, Middle Branch Road was classified for "moderate traffic," which includes major spur roads receiving log haul traffic up to 50 percent of the time.[20] In Finding of Fact (Finding) XV, the Board found that this level of log-hauling traffic "was within the contemplated levels of the WSA." Although the Board made no finding of fact on the issue, implicit in Finding XV is that the WSA properly classified the Middle Branch Road for moderate, rather than heavy, traffic.

### D. Rocking of Middle Branch Road

The Board concluded that rocking an existing road is considered a Class I activity under WAC 222-16-050(3)(g). Conclusion of Law V; AR at 62. Middle Branch Road was an existing road.

Stimson presented Dwight Opp's testimony to discredit Kettle Range's argument that rocking would cause a significant adverse impact on LeClerc Creek. Opp testified about the quality of the rock used for the process and offered an exhibit showing that the rock exceeded United States Forest Service (Forest Service) standards.

The DNR's witness, Loren Torgerson, also testified that the rocking process can benefit an area when performed correctly. Kettle Range's own exhibit, a letter from the United States Fish and Wildlife Service (Fish & Wildlife), recognized that rocking results in a "much improved road surface" and, after a settling period, rocking "can be expected to minimize sediment input to Middle Branch [Road]." AR at 2662. Consequently, the Board found that

---

[20] In contrast, "heavy" use, as defined in the Manual, describes a mainline logging road, where logs are hauled every few minutes for a sustained period.

rocking the Middle Branch Road would likely reduce sedimentation of watershed streams.

## E. Armoring of LeClerc Creek

The Forest Service placed boulders in LeClerc Creek to armor the stream bank for erosion control. A federal fisheries biologist helped with the armoring project. The rock was specially selected for its hardness, large size,[21] and lack of fine sediments.

Kettle Range alleged that placing boulders into the stream constituted a deposit of sediment into the stream, for which the Road Plan did not account and which violated the WSA. The Board disagreed, concluding that (1) the rocks placed in the creek were not "fine sediment" and (2) Kettle Range failed to offer sufficient evidence that the rock is "materially harmful to any element of the environment."

## F. Soil Prescription Errors

Stimson and the DNR provided extensive evidence supporting their belief that the prescriptions met regulatory requirements.[22] The Stimson WSA team required each landowner engaging in forest practices to ensure that additional sediment delivery[23] generated by these forest service practices increase sediment levels no more than 50 percent of existing background sediment levels. The DNR established that this level represented a low likelihood of adverse change to the stream. The prescriptions also required each landowner to develop a sediment-delivery-reduction plan

---

[21] The boulders varied in size from that of a loaf of bread to the size of a small desk.

[22] WAC 222-22-080(3)(b) requires that the DNR reject any prescriptions that do not accomplish the purposes and practices of chapter 222-22 WAC and chapter 76.09 RCW, the Forest Practices Act, to protect the environment while still encouraging viable forest practices.

[23] "Delivery level" reflects the amount of sediment that reaches waterways. For example, the higher the percentage, the more sediment Middle Branch Road will contribute to waterways in the LeClerc Creek watershed.

addressing methods to control sediment sources on roads that the landowners owned or controlled.

Witnesses testified about the effectiveness of the prescriptions. Nancy Sturhan, from the DNR, stated that the prescriptions were protective. JoAnn Metzler, a member of the assessment team, testified that the prescriptions would effectively prevent delivery of sediments to the streams at levels likely to cause harm. Stimson expert Dale McGreer also noted that the prescriptions were adequate to prevent significant harm to public resources from road erosion.

Kettle Range provided other evidence demonstrating that the prescriptions were insufficient to minimize negative impacts on the environment. The LeClerc Creek WSA indicated that (1) roads were already a major contributor of sediment to the streams in the area and (2) where road sediment was a concern, sediment control needed to focus on high-traffic roads located adjacent to stream channels. Kettle Range also identified roads omitted from the road inventory in the soil erosion prescriptions. Dale McGreer countered that the assessment/prescription team had not missed anything. This assertion turned out to be incorrect.

When Kettle Range questioned McGreer about the roads missing from his team's assessment report, he admitted that in making the assessment, he and his team had not actually walked the roads in the LeClerc Creek area. Rather, the Stimson team assessed the LeClerc Creek watershed primarily by car.

In contrast, Dr. Abbe, Kettle Range's expert, had walked the roads. In so doing, he had discovered roads missing from both Stimson's assessment report and the soil erosion prescriptions. Dr. Abbe noted that the effects of the omitted roads on sediment production would be "significant." He opined that overall the scientific quality of the work in the WSA was "grossly inadequate."

There were also errors in the sediment calculations in prescription number five. McGreer originally estimated a 65.5 percent sediment delivery level along Middle Branch

Road. At oral argument, Stimson asserted that, to some extent, the prescriptions would ameliorate existing erosion and sedimentation attributable to previous logging activities.

In contrast, Paul Kennard, an expert for Kettle Range, calculated the length of Middle Branch Road delivering sediment to LeClerc Creek and found an 85 percent delivery level. Kennard attributed the increased sediment delivery level to the increase in traffic on Middle Branch Road corresponding with logging in that area.

After Kennard's testimony, McGreer recalculated the sediment delivery level along Middle Branch Road. Using his original data sheets, he calculated a revised sediment delivery rate of 69 percent, but he offered no explanation for the deviation from original figures that he reported previously for use in formulating the soil-erosion prescriptions.

McGreer also failed to remove the coarse-sediment amounts from his calculation of background sediment levels, which set the baseline for the accepted 150 percent sediment-delivery level. Correcting this calculation changed the sediment-delivery hazard from low to high, requiring the team to modify the prescriptions.

IV. BOARD DECISION

The Board agreed with Stimson and the DNR, finding insufficient evidence that the prescriptions would fail to satisfy either chapter 222-22 WAC or chapter 76.09 RCW. It affirmed approval of the LeClerc Creek WSA and Stimson's forest practice applications.

The Board concluded that (1) the DNR properly classified the road-rocking as a Class I forest practice, (2) the DNR correctly classified the three forest-practice applications as Class III, (3) the holdings in ALPS II and III are instructive and not altered by RCW 43.21C.260(2), (4) the SEPA procedure the DNR used was consistent with ALPS II and III, (5) Kettle Range failed to show that the MDNS was

clearly erroneous, and (6) the DNR's approval of the WSA was not inconsistent with WAC 222-22-080(3)(a) or (b).

## V. JUDICIAL APPEAL

Kettle Range petitioned for judicial review under the Washington State Administrative Procedure Act (APA).[24] The superior court granted review, affirmed the Board, and denied relief to Kettle Range. Kettle Range appeals.

## ANALYSIS

### I. FOREST PRACTICES ACT

The legislature promulgated the Forest Practices Act to manage commercial harvest of "public and private commercial forest lands" "consistent with sound policies of natural resource protection." RCW 76.09.010(1); *see also ALPS* III, 99 Wn. App. at 582-83. Stated another way, the legislature found:

> that coincident with maintenance of a viable forest products industry, it is important to afford protection to forest soils, fisheries, wildlife, water quantity and quality, air quality, recreation, and scenic beauty.

RCW 76.09.010(1).

### A. Rule Promulgation and Enforcement

█ Consistent with the legislature's stated purpose, the Forest Practices Act of 1974, chapter 76.09 RCW,[25] and SEPA,[26]

---

[24] Chapter 34.05 RCW. Kettle Range sought judicial review under RCW 76.09.230(5) and RCW 34.05.510-.598.

[25] Legislative finding and declaration found in RCW 76.09.010:

(1) The legislature hereby finds and declares that the forest land resources are among the most valuable of all resources in the state; that a viable forest products industry is of prime importance to the state's economy; that it is in the public interest for public and private commercial forest lands to be managed consistent with sound policies of natural resource protection; that coincident with maintenance of a viable forest products industry, it is important to afford protection to forest soils, fisheries, wildlife, water quantity and quality, air quality, recreation, and scenic beauty.

chapter 43.21C RCW, regulate "forest practices." Forest practices include timber harvesting, precommercial thinning, reforestation, fertilization, prevention and suppression of diseases and insects, tree salvage, brush control, and road and trail construction. RCW 76.09.020(10).

The Forest Practices Act authorizes the Forest Practices Board to adopt forest practice rules. RCW 76.09.040(1),

---

(2) The legislature further finds and declares it to be in the public interest of this state to create and maintain through the adoption of this chapter a comprehensive statewide system of laws and forest practices rules which will achieve the following purposes and policies:

(a) Afford protection to, promote, foster and encourage timber growth, and require such minimum reforestation of commercial tree species on forest lands as will reasonably utilize the timber growing capacity of the soil following current timber harvest;

(b) Afford protection to forest soils and public resources by utilizing all reasonable methods of technology in conducting forest practices;

(c) Recognize both the public and private interest in the profitable growing and harvesting of timber;

(d) Promote efficiency by permitting maximum operating freedom consistent with the other purposes and policies stated herein;

(e) Provide for regulation of forest practices so as to avoid unnecessary duplication in such rules;

(f) Provide for interagency input and intergovernmental and tribal coordination and cooperation;

(g) Achieve compliance with all applicable requirements of federal and state law with respect to nonpoint sources of water pollution from forest practices;

(h) To consider reasonable land use planning goals and concepts contained in local comprehensive plans and zoning regulations;

(i) Foster cooperation among managers of public resources, forest landowners, Indian tribes and the citizens of the state; and

(j) Develop a watershed analysis system that addresses the cumulative effect of forest practices on, at a minimum, the public resources of fish, water, and public capital improvements of the state and its political subdivisions.

(3) The legislature further finds and declares that it is also in the public interest of the state to encourage forest landowners to undertake corrective and remedial action to reduce the impact of mass earth movements and fluvial processes.

(4) The legislature further finds and declares that it is in the public interest that the applicants for state forest practices permits should assist in paying for the cost of review and permitting necessary for the environmental protection of these resources.

[26] As the legislature directed, the Department of Ecology adopted the SEPA rules, chapter 197-11 WAC, which the Forest Practices Board, in turn, adopted by reference, except for "those rules that may not be applicable." WAC 222-10-050. *See also ALPS* III, 99 Wn. App. at 583-84.

.050.[27] To the extent that forest practice rules relate to water quality, the Department of Ecology (Ecology) must also promulgate the rules. RCW 76.09.040(1)(e); *ALPS* III, 99 Wn App at 583. The DNR administers and enforces the forest practice rules. RCW 76.09.040(1)(e).

■ The Forest Practices Board also establishes by rule which forest practices fit into each of four defined classes, based on their potential environmental impacts. Class IV forest practices,[28] for example, "have a potential for a substantial impact on the environment and therefore require an evaluation by [DNR] as to whether or not [an EIS] must be prepared . . . ." RCW 76.09.050(1); *see also* RCW 43.21C.037(3). In contrast, Class I, II, and III forest practices are exempt from the EIS requirement. RCW 76.09-.050(1); RCW 43.21C.037(1).

The legislature also required that the Department of Ecology, in its SEPA rules "provide for certain circumstances where actions which potentially are categorically exempt require environmental review." RCW 43.21C.110-(1)(a).

## B. Watershed Analyses

In 1992, the Forest Practices Board and Ecology adopted major changes to the Forest Practices Rules, a major component of which is the watershed analysis—a process for gathering environmental information about watershed administrative units (WAU). WAUs are discrete hydrological units defined by the DNR in cooperation with other watershed experts. WAC 222-22-020. The DNR sets minimum qualifications for the analysts, specialists, and field managers who conduct watershed analyses; the DNR also registers them and monitors their performance. WAC 222--22-030.

---

[27] *See also* RCW 76.09.040(1)(e) and water quality rules discussion in Analysis section I. C. *infra*.

[28] "The [Forest Practices Board] determines, by rule, which forest practices are Class IV and therefore subject to SEPA." *ALPS* III, 99 Wn. App. at 583.

A watershed analysis can be conducted by either the DNR or by the owner(s) of 10 percent or more of the nonfederal forest-land acreage in a watershed analysis unit. WAC 222-22-040(3). An owner who proposes to conduct his own watershed analysis must give notice to the DNR, identifying the analysts who will do the work. The DNR then determines whether these analysts are qualified. WAC 222-22-040(3).

The purpose of the watershed analysis is (1) to evaluate and to mitigate the cumulative effects of forest practices on fish, water, and capital improvements by the state and its political subdivisions; and (2) to preserve and to protect these valuable public resources while maintaining a viable forest products industry. WAC 222-22-010(1). The rules are

> intended to be applied and should be construed in such a manner as to minimize the delay associated with the review of individual forest practice applications and notifications by increasing the predictability of the process and the appropriate management response.

WAC 222-22-010(5).

## 1. Resource assessment

A watershed analysis entails several steps. The first step is resource assessment by qualified scientists. Resource assessment involves gathering and interpreting data about the watershed and assessing resource conditions in order to identify, to define, and to map areas of resource sensitivity based on the risks to fish, water, and public capital improvements from the cumulative effects of forest practices. WAC 222-22-050(2)(a), (b), (d).

## 2. Prescriptions

In identified resource-sensitive areas, standard forest practices rules alone do not adequately protect the resource. Thus, these areas require a "management response." WAC 222-22-050(2)(d), (f); WAC 222-22-070(3).

Accordingly, the second step of a watershed analysis involves a team of qualified field managers who develop a set of prescriptions—additional restrictions that exceed and supplement standard forest practices rules governing harvesting, road building, or other forest activities, designed to minimize, to prevent, or to avoid the likelihood of adverse change. WAC 222-22-070(1)-(3). The field managers then recommend the prescriptions to the DNR and must include an alternate plan that meets or exceeds the protection of the prescriptions, or be considered a "Class IV-special" and undergo SEPA review. WAC 222-22-070(3); WAC 222-16--050(1)(d).

### 3. SEPA review

Third, the DNR reviews the draft watershed analysis and circulates copies for review and comment to Ecology, Fish and Wildlife, affected tribes, local governments, other landowners in the watershed administrative units, and the public. WAC 222-22-080(1). Under the watershed analysis rules, Class I, II, and III forest practices are generally exempt from a SEPA threshold determination. RCW 76.09.050(1)(e). Class IV forest practices are those that are not Class I, II, or III forest practices and include those that "have a potential for a substantial impact on the environment." RCW 76.09.050(1)(e). Class IV practices require SEPA review. *See* RCW 76.09.050(1) (Class IV); RCW 43.21C.037(3).

For Class IV Forest Practices, the DNR reviews the proposed prescriptions and issues a threshold SEPA determination according to the SEPA rules. WAC 197-11-310 through -360. Before issuing a threshold determination, however, the DNR must consider cumulative effects of the proposed action on the environment, namely, changes to the environment as a result of natural ecosystems interacting with the effects of two or more forest practices. WAC 222-12-046.

The DNR cannot make a determination of significance unless the proposed prescriptions, compared to rules

and other prior prescriptions in place, "will cause probable significant adverse impact on elements of the environment other than those addressed in the watershed analysis process." RCW 43.21C.260(2). An EIS is required when there are probable significant adverse impacts that cannot be mitigated through clarification or change in the prescriptions. RCW 43.21C.031(2); WAC 197-11-350(2) through -360(1).

## 4. Approval

Finally, the DNR must approve the draft watershed analysis unless it finds that (1) the assessment team failed to follow the approved methodology, (2) the team could not reasonably have come to the conclusion it did in the analysis, or (3) the prescriptions will not accomplish their specified purposes. WAC 222-22-080(3).

## C. Water Quality

Ecology and the Board work together to adopt forest practice rules affecting water quality. RCW 76.09.040(1)(e). RCW 90.48.420(1) requires that adoption of forest practice rules pertaining to water quality "shall be accomplished so that compliance with such forest practice[s] rules will achieve compliance with water pollution control laws." Similarly, RCW 90.48.425 provides that the Forest Practices Act, chapter 76.09 RCW, and the forest practices regulations that relate to water quality protection, shall satisfy the planning and program requirements of the federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387.

## D. Appeals

The Forest Practices Appeals Board hears appeals of DNR actions under the Forest Practices Act. RCW 76-.09.220(7).

II. STANDARDS OF REVIEW

A. Administrative Appeals

The APA governs appeals from Forest Practices Appeals Board decisions. RCW 76.09.230(5). Accordingly,

we may overturn the [Board's] decision only if "[t]he agency has erroneously interpreted or applied the law" or "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(d), (e).

*ALPS* III, 99 Wn. App. at 588.

In reviewing administrative decisions, such as those by the Board, we stand "in the same position as the superior court." *Swoboda v. Town of La Conner*, 97 Wn. App. 613, 617, 987 P.2d 103 (1999), *review denied*, 140 Wn.2d 1014 (2000). Thus, we apply the standard of review directly to the same administrative record that the superior court reviewed. *Wilson v. Employment Sec. Dep't*, 87 Wn. App. 197, 200, 940 P.2d 269 (1997). The entire record is open to judicial scrutiny, and we must consider the public policy and environmental values of SEPA as well. *Sisley v. San Juan County*, 89 Wn.2d 78, 84, 569 P.2d 712 (1977).

We review an administrative agency's factual findings under the "substantial evidence" test set forth in RCW 34.05.570(3)(e). Evidence is substantial when there is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

Additionally, the DNR's threshold SEPA determination is entitled to "substantial weight." RCW 43.21C.090. Upon reviewing such threshold determination, the Board must affirm unless it finds the determination to be "clearly erroneous." *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 275, 552 P.2d 674 (1976).

In reviewing the Board's approval of a threshold determination, we apply the error of law standard set out in

RCW 34.05.570(3)(d) to the Board's final order upholding the DNR's threshold determination. The "clearly erroneous" standard does not allow us to reverse the DNR's threshold SEPA determination unless we are "left with the definite and firm conviction" that a mistake has been committed. *Anderson v. Pierce County*, 86 Wn. App. 290, 302, 936 P.2d 432 (1997). Such is the case here, at least in part.

## B. Summary Judgment

■ Summary judgment is appropriate only if there is no issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We review summary judgment de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

■ ■ The APA does not expressly authorize summary judgments, but case law has established that agencies may employ summary proceedings. *See Eastlake Cmty. Council v. City of Seattle*, 64 Wn. App. 273, 276, 823 P.2d 1132, *review denied*, 119 Wn.2d 1005 (1992). Thus, the Board's regulations allow motions for summary judgment in accordance with CR 56. WAC 223-08-148(1).

Consequently, we consider the APA standard of review together with the summary judgment standard of review, viewing disputed facts in the light most favorable to the nonmoving party while considering whether the moving party is entitled to judgment as a matter of law if based on undisputed facts. *ALPS* II, 102 Wn. App. at 13-14.

### III. CLEAN WATER CLAIMS

Kettle Range argues that the Board erroneously determined on summary judgment that the Board did not have jurisdiction to hear Kettle Range's claim that the DNR

failed to comply with federal and state clean water acts.[29] We disagree.

Kettle Range contends that the Board's ruling permitted Stimson and the DNR to "exempt themselves from state water quality standards." Bill Bidstrup, DNR aquatic resources specialist, testified that he knew the water quality in the LeClerc Creek basin was not in compliance with existing standards. He also testified, however, that (1) the clean water acts delegated authority to the Forest Practices Board to promulgate rules to comply with the state's clean water standards and (2) therefore, the clean water standards applied only to forest practices under the Forest Practice Rules.

The Board deemed Kettle Range's argument a challenge to chapter 222-22 WAC and concluded that challenges to the Forest Practices Rules were not properly before it. We agree with the Board.

The Forest Practices Board and Ecology jointly promulgate the Forest Practice Rules determining water quality standards. RCW 76.09.040(1)(e). The rules are adopted such that "compliance with such forest practice[s] rules will achieve compliance with water pollution control laws." RCW 90.48.420(1).[30]

---

[29] Congress enacted the Federal Water Pollution Control Act Amendments in 1972. After amendments in 1977, the law became commonly known as the Clean Water Act. The Act established the basic structure for regulating discharges of pollutants into the waters of the United States. U.S. Environmental Protection Agency, *Clean Water Act, at* http://www.epa.gov/r5water/cwa.htm (last visited Nov. 26, 2003). It is located in Title 33 of the United States Code.

The State's clean water act is codified at chapter 90.48 RCW and is titled the water pollution control act. The act provides:

It is declared to be the public policy of the state of Washington to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington.

RCW 90.48.010.

[30] We reject Kettle Range's argument that RCW 90.48.420 is ambiguous; thus, we do not consider the statute's legislative history.

■ Kettle Range does not argue that the WSA fails to satisfy the water quality standards set forth in chapter 222-22 WAC or that the prescriptions fail to comply with the watershed analysis rules. Rather, Kettle Range argues that the prescriptions do not comply with the Clean Water Acts, thereby implying that the chapter 222-22 WAC water quality standards, promulgated by the Forest Practices Board and Ecology, are inadequate.

Under the APA, such a challenge to the validity of an administrative rule must be brought as a petition for declaratory judgment in Thurston County Superior Court. RCW 34.05.570(2)(b). This Kettle Range failed to do. Accordingly, the Board correctly concluded that it had no jurisdiction to hear Kettle Range's claim that the forest practice rules at issue here do not comply with water pollution control laws. RCW 34.05.570(2).

IV. FUTURE FOREST PRACTICES

A. *Selkirk Conservation Alliance v. Forsgren*

Before commencing the watershed analysis here, Plum Creek, Stimson's predecessor-in-interest, sought an easement from the Forest Service to access one of its parcels in Colville National Forest. Although that easement is not part of this appeal, the proceedings for granting that easement provide a helpful context for the issues before us.

In 1993, Stimson worked with the U.S. Forest Service and Fish and Wildlife Service (Fish & Wildlife) to acquire the easement. *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 949 (9th Cir. 2003). The land Stimson sought to access was within the LeClerc Bear Management Unit (BMU).[31] After evaluating the project's impacts on threatened and endangered species,

---

[31] Most of the LeClerc Creek watershed lies within the Selkirk Mountain Grizzly Bear Recovery Area, as designated by the Interagency Grizzly Bear Committee. Each grizzly bear recovery area is divided into several grizzly bear management units, which are used for habitat evaluation and population monitoring. The LeClerc watershed includes a large portion of the LeClerc BMU, and maps of the watershed show the location of grizzly bear habitat in or near the area Stimson proposes to log.

Fish & Wildlife drafted a biological opinion finding that the project would place some species in jeopardy.

Fish & Wildlife put the opinion on hold while it, the Forest Service, and Plum Creek negotiated a multiparty Conservation Agreement to mitigate the project's effects. *Selkirk*, 336 F.3d at 949. The Conservation Agreement dictated how Stimson would manage *all* of its land in the LeClerc BMU, not just those lands accessed by the easement.[32]

Ultimately, the Forest Service prepared a draft EIS. 336 F.3d at 950. Stimson, the Forest Service, and Fish & Wildlife revised the Conservation Agreement, creating "an ecosystem-based management plan throughout the LeClerc BMU." 336 F.3d at 950. The Conservation Agreement addressed impacts on grizzly bear, caribou, and the newly listed threatened bull trout, with numerous detailed provisions designed to preserve habitat and to lower bear mortality in the LeClerc BMU. 336 F.3d at 964.

In 2000, the Forest Service issued a final EIS. 336 F.3d at 950. The EIS did not reference the impact of at least six[33] specific Stimson harvests planned in the LeClerc BMU. But it did note the Forest Service's presumption that Stimson would eventually harvest all of its lands. 336 F.3d at 951. The EIS contemplated that, in addition to the proposed construction of 1.88 miles of new road and reconstruction of 0.81 miles of existing road, Stimson would ultimately construct 15.4 miles of new road, reconstruct 0.8 miles of existing road, and harvest approximately 1,577 acres of its land. 336 F.3d at 949.

In 2001, Fish & Wildlife issued its final biological opinion, finding that Stimson's project would not jeopardize threatened and endangered species in the area. 336 F.3d at 952. Both the Forest Service and Fish & Wildlife had concerns about potentially harmful effects of the project on grizzly

---

[32] See *Selkirk*, 336 F.3d at 949, for a thorough and detailed analysis of the Conservation Agreement requirements.

[33] On appeal, the various groups challenging the project cited 17 proposed projects that had not been considered in the EIS. *Selkirk*, 336 F.3d at 961.

bear. Nonetheless, Fish & Wildlife "concluded that—although the Stimson Project may adversely affect the grizzlies—it will not jeopardize their existence." 336 F.3d at 953.

A number of conservation groups (the Groups), including Kettle Range Conservation Group, appealed the Forest Service's grant of the easement to Stimson. The district court granted summary judgment in the agencies' favor, and the Groups appealed. 336 F.3d at 953. The Groups argued, inter alia, that (1) the Forest Service violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4370f in failing to consider reasonably foreseeable Stimson activities in the EIS cumulative impacts analysis; and (2) Fish & Wildlife violated the Endangered Species Act in failing to consider reasonably foreseeable activities in its 2001 biological opinion. 336 F.3d at 954.

Affirming, the Ninth Circuit held that the Forest Service had adequately considered future forest practices when it presumed that Stimson would eventually log all of its lands, thus "reduc[ing] the need to list, map, and discuss every pending Stimson harvest plan" individually. 336 F.3d at 961. The court also held that the Endangered Species Act does not require Fish & Wildlife to "list, detail, and discuss each and every forest practices application," as long as Fish & Wildlife considers the impacts of the future activities. 336 F.3d at 964. The court reasoned that Fish & Wildlife's use of the Conservation Agreement to analyze cumulative impacts was sufficient under the Endangered Species Act. 336 F.3d at 964-65. The crux of these holdings is that because the Conservation Agreement governs all of Stimson's activities in the LeClerc BMU, the mitigating measures will apply to all future projects uniformly and, thus, wildlife and the environment will be protected.

## B. *Selkirk* and the LeClerc Watershed Analysis

*Selkirk* resolves two main issues here: (1) whether the DNR sufficiently considered the effects of future forest

practices in approving the WSA and issuing the MDNS; and (2) whether grizzly bear and their habitat are sufficiently protected.

### 1. Future Forest Practices and the LeClerc WSA

The Ninth Circuit did not decide *Selkirk* until after oral argument in the case before us. Consequently, both parties relied on *ALPS* II, 102 Wn. App. 1, 979 P.2d 929 (1999), and *ALPS* III, 99 Wn. App. 579, 993 P.2d 287 (2000), in discussing whether future impacts were sufficiently addressed here. But neither *ALPS* II nor *ALPS* III provide direction about what constitutes sufficient consideration of future forest practices. Moreover, Stimson subsequently cited *Selkirk* as supplemental authority here. Thus, we look to *Selkirk* for guidance.

Adopting the Ninth Circuit's reasoning in *Selkirk*, we hold that (1) the DNR sufficiently considered future forest practices when it issued the MDNS and approved the WSA; and (2) the record contains substantial evidence to support this conclusion. As was the case in *Selkirk*, the DNR assumed, for MDNS and WSA purposes, that Stimson would eventually log all of the land.

The Board made the same assumption.[34] The Board found that requiring a list of specific harvests might not accomplish the same purpose as assuming all land would be logged, primarily because these harvest plans would likely change in response to market forces.

The Conservation Agreement and its attendant EIS discussed in *Selkirk* also inform our holding. We agree with the Ninth Circuit that the Conservation Agreement and the EIS sufficiently address future forest practices in the LeClerc BMU. First, the Conservation Agreement is land specific, not project specific; consequently, the Conservation Agreement restrictions and requirements apply to *all* of Stimson's activities in the LeClerc BMU, both current and

---

[34] In support of this assumption, Dwight Opp testified that the intent behind completion of the WSA was to log all of Stimson's land.

future. Second, we agree that the EIS prepared in conjunction with the easement procurement presumed that all of Stimson's lands would be harvested. Third, the Ninth Circuit noted that the EIS already contemplated the activity that Kettle Range claims is absent from consideration in the WSA, namely, construction of 15.4 miles of new road, reconstruction of 0.8 miles of roads, and harvest of 1,577 acres of timberland. 336 F.3d at 949.

Both the Conservation Agreement and the EIS were before the Board when it reviewed the LeClerc Creek WSA. The Ninth Circuit's holding in *Selkirk* obviates the need for preparation of another EIS.[35] Because we find that substantial evidence supports the Board's conclusion "in light of the whole record before the court," RCW 34.05.570(3)(e), we reject Kettle Range's claim that the DNR did not sufficiently address future forest practices.[36]

## 2. Grizzly Bear Protection

As we noted above, the primary purpose of the Conservation Agreement was to address and to ameliorate the impacts of Stimson's activities on wildlife—particularly grizzly bear—in the LeClerc BMU. The Conservation Agreement aims to "minimize displacement of grizzly bear from spring range,[37] to maintain functional female grizzly

---

[35] The DNR would not need to prepare a separate EIS in any event. When "an adequate detailed statement has been previously prepared pursuant to [NEPA] . . . said prepared statement may be utilized in lieu of a separately prepared statement under RCW 43.21C.030(2)(c)." RCW 43.21C.150.

[36] Kettle Range argued on summary judgment that the Conservation Agreement and EIS are inadequate to address the issues on all of Stimson's land because they were limited to land in the LeClerc BMU, which is only a portion of Stimson land. But the EIS did consider the proposed 15 miles of new roads, reconstruction of old roads, and the 1,577 acres of timber harvest. Thus, the EIS seems to have considered the most contentious activities in the watershed, whether they lie inside or outside of the BMU.

[37] "Spring range" refers to the areas of spring bear habitat identified in Attachment C to the Conservation Agreement. Spring use areas "are the most critical and limiting habitats for grizzly bear survival." Bear roam the spring range in the post-denning spring period, a critical time of year for bear. *See also Selkirk*, 336 F.3d at 952.

bear home range in the BMU, and to reduce the potential for human-caused mortality." 336 F.3d at 949.

The Conservation Agreement imposes many restrictions on the timing and nature of activities in the LeClerc BMU, designed to diminish impacts on the grizzly bear. The Conservation Agreement provides that (1) there will be no net gain in open roads, which negatively impact bear habitat, (2) newly constructed roads will be closed to public motorized access, and (3) there will be only limited access to several restricted roads. 336 F.3d at 957.[38] The Conservation Agreement also requires that Stimson maintain (1) trees that visually screen bear habitat, and (2) "40 percent 'cover' (areas of prime bear habitat) in the LeClerc BMU." 336 F.3d at 949. The Conservation Agreement further requires "that all harvest units 'be [laid] out so that no point in the unit is more than 600 feet from cover.' "[39] 336 F.3d at 949. Stimson must also avoid commercial use in almost 4,500 acres of winter logging area, " 'provid[ing] a large block of available spring habitat' that 'is a benefit to the grizzly bear.' "[40] 336 F.3d at 957. Again, these restrictions and obligations apply to all of Stimson's activities in the LeClerc BMU.

Based on our own reading and the Ninth Circuit's characterization of the Conservation Agreement, we conclude that the Conservation Agreement adequately addresses

---

[38] In 1994, the Interagency Grizzly Bear Committee produced a report that included recommendations for standardizing how to classify roads in grizzly recovery habitat (i.e., open, restricted, or reclaimed/obliterated). "Reclaimed" or "obliterated" roads are those that are not safely drivable or roads that are brushed in. "Restricted" roads have been physically blocked with a gate or other device but are otherwise driveable. Most roads are physically closed throughout the LeClerc BMU in order to meet the seclusion standard.

[39] Each BMU requires at least 70 square miles of "seclusion habitat" to be maintained at all times. "Seclusion habitat" is defined as areas lying beyond a one-quarter-mile "zone of influence" around open roads, high-use trails, and campgrounds. Within the zone of influence, bear are most prone to being disturbed and displaced from suitable habitat by encounters with vehicle traffic or people on foot.

[40] In *Selkirk*, the agencies agreed that the most critical time of the year for the bear is April 1 to June 15, which is the post-denning period.

future potential impacts on the grizzly bear habitat and population. As the *Selkirk* court notes:

> In assessing the significance of the Agreement, we note that Stimson owns thousands of acres of land within the LeClerc BMU, only a fraction of which will be accessed by the Stimson Project. *But the Agreement establishes standards of timber management that Stimson must follow on all of its LeClerc lands*, not just those lands to be accessed by the Stimson Project. Absent the Agreement, Stimson would be free to harvest timber and build roads on its LeClerc holdings in whatever manner Stimson chose, so long as Stimson complied with state and federal timber regulations. *The Agreement thus imposes obligations on Stimson that go far beyond state and federal laws.*

336 F.3d at 955 (emphasis added).

Applying the clearly erroneous standard of review, Kettle Range has not shown that the DNR inadequately considered the impact of future forest practices on grizzly bear.

V. Sedimentation Calculations

Kettle Range argues that the soil erosion prescriptions are insufficient to satisfy the purpose and requirements of WAC 222-22-010 and -070(3). WAC 222-22-070(3) provides that the prescriptions "be reasonably designed to 'minimize' or to prevent or avoid . . . the likelihood of adverse change and deliverability that has the potential to cause a material, adverse effect to resource characteristics." The DNR counters that even with the proposed new forest practices, the prescriptions are an improvement over existing, ongoing environmental damage caused by previous, nonmitigated forest practices.

But even assuming that these prescriptions provide more environmental protection than does the status quo, this fact does not satisfy the legal requirement that the prescriptions must meet minimum protective standards. WAC 222-22-070(3). Thus, we agree with Kettle Range on this point.

## A. Errors in the Soil Prescriptions

 Kettle Range asserts that the DNR's soil prescriptions violate WAC 222-22-080(3)(b) because they will not adequately protect public resources. Several omissions in the soil erosion prescriptions led the DNR to issue a threshold determination of nonsignficance, unwittingly based on incorrect information.

Contrary to the Board's finding, the record contains substantial evidence that inadequate soil erosion prescriptions will probably lead to additional damage to the very natural resources that the prescriptions are intended to protect, namely, the streams in the LeClerc watershed. For example, the record shows omissions of roads[41] from the watershed analysis and errors in sediment-delivery calculations.

The prescriptions were drafted to ameliorate adverse impacts from fewer roads than Stimson's proposal contemplates. Dr. Abbe testified that the omission of roads from the calculations will have "significant" impact on sediment production. Consequently, the prescriptions do not address the presumptive increase in sedimentation from the omitted roads, which sedimentation will potentially reach watershed waterways and adversely affect water quality and fish habitat.

On the record before us, we cannot determine whether these omissions are so significant as to render inadequate the prescriptions, which are based on defective data.

### 1. Roads omitted from soil prescriptions

It is uncontroverted that segments of road likely to produce and to deliver sediment into the streams and rivers in the watershed were omitted from the road inventory. The record shows that introduction of this unaccounted-for

---

[41] This road omission is critical to the sedimentation calculations in the prescriptions and Road Plan because roads are a major producer of sedimentation in the waterways on Stimson land.

sediment into these waters will have adverse environmental impacts on fish in the area. One omitted road is of particular concern because it runs closer to a stream than does the adjacent, identified road. Potentially more sediment could reach the stream as a result of this closer, but thus far unacknowledged, proximity.

When Kettle Range questioned Stimson's expert about these overlooked road segments, McGreer admitted that in making the watershed and sediment assessment, he and his team had not walked the LeClerc Creek area roads. As a result, the assessment team developed the soil prescriptions based on McGreer's incorrect road-number calculation, as well as inaccurate, or at least incomplete, data about road location in relation to streams. Clearly, the prescriptions did not take into account these omitted roads.

### 2. Erroneous sediment-delivery-level calculations

There were also errors in the sediment calculations discussed in prescription five. Using the same data Stimson had provided to the DNR, Kettle Range's calculations varied greatly from Stimson's. When Stimson recalculated the sediment-delivery rate during trial, it produced a result different from the one it had provided to the prescriptions team. Thus, the sediment reduction for the Middle Branch calculated in the prescriptions is overly optimistic and likely will not meet the stated goal of less than 50 percent over background. Similarly, Stimson's inability to reproduce the rate-of-sedimentation calculation that it previously provided to the DNR calls into question whether Stimson correctly formulated the sediment calculations on which the sedimentation prescriptions were based.

Based on inaccurate sedimentation calculations, the prescriptions are potentially inadequate to prevent or to control the resultant negative effects on public resources. In other words, the prescriptions could allow more sediment to reach watershed waterways than the amount allowable under the Forest Practices Act.

### 3. Background calculations

Public review of the prescriptions revealed that McGreer had failed to remove the coarse sediment fraction in calculating the sedimentation background.[42] Correcting this calculation error in the sediment-delivery hazard-risk for the prescriptions, from low to high hazard, caused the prescriptions team to develop new "prevent or avoid" prescriptions to meet legal standards for protection of public resources in the watershed.

In sum, there is sufficient evidence in the record to call into question whether the soil prescriptions will protect public resources as contemplated by the DNR and required by law. Thus, absent information to the contrary, these prescriptions violate WAC 222-22-080(3)(b).

### B. Road Maintenance and Sediment Reduction Plan

 As the WSA required, Stimson prepared the Road Plan to detail its strategy for sediment reduction. The WSA required that the Road Plan "identif[y] . . . specific road segments owned or controlled by the landowner and amount of sediment produced by each." AR at 3917. The Road Plan specified the amount of reduction required based on the road segments Stimson owns. The Road Plan identifies Stimson roads by exhibit number—the same exhibits that Kettle Range's expert identified as containing roads not accounted for in the WSA.

The Road Plan quantifies sedimentation tonnage based on calculations from existing roads' sediment delivery.[43] Because Stimson's Road Plan fails to identify all of its existing roads, the Road Plan does not accurately address all road-related sedimentation and, therefore, it fails to

---

[42] The parties do not explain why removal of the coarse sediment fraction is necessary for calculating background. Presumably, by leaving the coarse sediment levels in, the overall background level will increase, allowing a greater allowable sediment delivery under the 150 percent scheme.

[43] It does not include a blanket requirement that all roads, whether specified or not, comply with the 150 percent sedimentation standard.

satisfy WSA requirements. Accordingly, the Road Plan must be revised.

On remand, Stimson must accurately identify all existing roads, calculate existing sediment delivery levels based on this corrected road inventory, and then recalculate the necessary level of sediment reduction in tonnage.

## C. Impacts on Bull Trout

Kettle Range challenges the DNR's issuance of the Addendum to the MDNS, arguing that the Addendum inadequately addressed the impacts of Stimson's proposed activities on the threatened bull trout. But as all of the testifying experts generally agreed, it is difficult to detect a change in sediment delivery below the 50 percent threshold. Thus, on remand, Stimson must revise its prescriptions and Road Plan to ensure that sediment-delivery levels remain within 150 percent of background, the level at which there should be no detectable adverse effect of sedimentation on bull trout.

## VI. Attorney Fees

Kettle Range requested attorney fees below.[44] The equal access to justice act, RCW 4.84.350, provides an award of attorney fees and costs up to $25,000 to a prevailing party where the court finds that the agency's action was not substantially justified. "A qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit" it sought. RCW 4.84.350(1). The courts define "substantially justified" as "justified to a degree that could satisfy a reasonable person." *ALPS* II, 102 Wn. App. at 19.[45] Kettle Range argues that the DNR's position was not substantially

---

[44] The superior court's order simply affirmed the Board's order and did not address the attorney fees issue. Br. of DNR, Ex. H.

[45] *See also Moen v. Spokane City Police Dep't,* 110 Wn. App. 714, 721, 42 P.3d 456 (2002); *Hunter v. Univ. of Wash.,* 101 Wn. App. 283, 294, 2 P.3d 1022 (2000), *review denied,* 142 Wn.2d 1021 (2001).

justified because it was similar to the erroneous position the DNR took in *ALPS* II. We disagree.

First, we must decide whether Kettle Range is the prevailing party. We have affirmed the Board's conclusion that no EIS is necessary. Thus, this case differs from *ALPS* II, where the court reversed and remanded for preparation of an EIS after determining that the DNR had not considered future forest practices at all. *ALPS* II, 102 Wn. App. at 19. Kettle Range does not prevail on this issue.

Second, we hold that the DNR sufficiently considered the impacts of future forest practices. Thus, Stimson and the DNR are the prevailing parties on this issue, not Kettle Range.

But we reverse the Board's approval of the WSA and the MDNS, and we remand for corrections. This remand resolves a significant issue[46] in Kettle Range's favor, namely limiting sediment delivery to levels that will not adversely affect the environment. Thus, Kettle Range is the prevailing party on this issue. But even though Kettle Range has prevailed on some issues, it is not necessarily entitled to attorney fees.

We hold that the DNR was substantially justified in approving the WSA. There is no evidence that the DNR was aware of the omitted roads or the sediment-calculation flaws when it approved the WSA. Instead, the DNR based its approval on the thorough and detailed WSA that was the result of concerted efforts by the Resource Assessment Team and the Prescriptions Team, comprising at least 12 specialists from the DNR, the Kalispel Tribe, and industry. And although the WSA noted that 10 percent of the roads had not been evaluated in the field, it also noted that any errors in the modeling of these remaining roads would likely be on the conservative side.

A reasonable person would believe that the road inventory and calculations were correct as did the DNR. *ALPS* II,

---

[46] *Cf. Citizens for Fair Share v. Dep't of Corr.*, 117 Wn. App. 411, 436, 72 P.3d 206 (2003) (denying attorney fees when citizen's group prevailed only on one "relatively minor" issue).

102 Wn. App. at 19. Thus, we hold that because the DNR was substantially justified in approving the WSA, Kettle Range is not entitled to attorney fees under RCW 4.84.350.

## CONCLUSION

We hold that there was sufficient evidence in the record to support the Board's finding that the WSA sufficiently considered future forest practices and their impact on wildlife, especially the grizzly bear. Thus, we affirm in part.

But we also hold that the Board clearly erred in affirming the DNR's issuance of the MDNS and its approval of the LeClerc Creek watershed analysis and prescriptions, which were based on acknowledged factual errors and miscalculations. Therefore, we reverse the Board's decision and remand to the DNR (1) to correct the sedimentation calculations, prescriptions, and Road Plan and (2) then to determine if, as revised, the WSA and Road Plan comply with the Forest Practices Rules and the rules for WSA approval.

SEINFELD and HOUGHTON, JJ., concur.

Motion for reconsideration of respondent Department of Natural Resources granted, opinion modified, and motion for reconsideration of respondent Stimson Lumber Company denied March 16, 2004.

Review denied at 152 Wn.2d 1026 (2004).