[No. 52810-6-I.   Division One.   January 10, 2005.]

SILVERSTREAK, INC., ET AL., *Appellants*, v. THE DEPARTMENT OF
LABOR AND INDUSTRIES, *Respondent*.

*John P. Ahlers* (of *Short, Cressman & Burgess, P.L.L.C.*) and *Anne-Marie E. Sargent* (of *Connor & Chung, P.L.L.C.*), for appellants.

*Robert M. McKenna, Attorney General*, and *Amanda J. Goss, Assistant*, for respondent.

¶1 Cox, C.J. — Truck drivers who deliver sand, gravel, crushed rock, concrete mix, asphalt, or other similar materials to a public works project site are beneficiaries of Washington's prevailing wages statute[1] when they "spread[ ], level[ ], roll[ ], or otherwise participate in the incorporation of the [delivered] materials into the project."[2] Drivers who do not so participate in the incorporation of materials into the project are not entitled to prevailing wages.[3]

¶2 Here, the director of the Department of Labor and Industries (L&I) determined that end-dump truck drivers employed by Silverstreak, Inc., T-Max Construction, Stowe Construction, Gary McCann Trucking, and Buckley Recycling (the Companies) "participated in 'incorporation' under WAC 296-127-018(2) of fill material into" a public works

---

[1] RCW 39.12.010- .900

[2] WAC 296-127-018(2)(a).

[3] WAC 296-127-018(3)(a).

project. Accordingly, the director concluded that the drivers are entitled to be paid prevailing wages.

¶3 We hold that the record shows that the end-dump truck drivers neither spread, leveled, nor rolled any of the fill material that they delivered to the site. Moreover, they did not "otherwise participate in the incorporation" of fill material at the site. We reverse.

¶4 This prevailing wage case arises from work the end-dump truck drivers performed at a public works project. The facts are largely undisputed.

¶5 The project was Phase 1 of the Sea-Tac Third Runway Embankment Project. The objective of Phase 1 was to clear 20 acres of land at Seattle-Tacoma International Airport and to construct a runway embankment with fill material. This required the delivery of approximately 800,000 cubic yards of fill material. There is no dispute that the fill material here was the type specified in the regulation at issue.

¶6 City Transfer, Inc., (CTI) was the prime contractor for the work. It subcontracted with the Companies to supply and deliver fill material for the construction of the embankment.

¶7 Between the last week in May and the second week of December 1998, the Companies delivered fill material to the site using two types of vehicles.[4] An end-dump truck and trailer (pup) combination was one type.[5] The other was a belly-dump truck combination.[6] We describe more fully later in this opinion how the drivers of these vehicles delivered fill material to the site.

---

[4] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 5 of Dir's Order, Admin. R. at 3341-42.

[5] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 5 of Dir's Order, Admin. R. at 3342.

[6] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 5 of Dir's Order, Admin. R. at 3342.

¶8 The Companies paid the belly-dump truck drivers prevailing wages. But they paid the end-dump truck drivers market wages.

¶9 L&I issued notices of violations to the Companies for failure to pay end-dump truck drivers prevailing wages for work they did at the public works project site. The Companies objected, taking the position that the nature of the work these drivers performed was limited to delivery of materials and did not include participation in any incorporation of the delivered materials into the project.

¶10 Following a hearing, an administrative law judge (ALJ) concluded that the method of delivery of the fill to the project by the end-dump truck drivers did not constitute participation in incorporation of materials into the project.[7] Following review of the ALJ's proposed findings and conclusions, the director disagreed.

¶11 The director concluded that there were two bases under WAC 296-127-018 for the end-dump truck drivers to be paid the prevailing wage. First, the drivers participated in incorporation of the fill by depositing it directly on the embankment rather than stockpiling it at a central location. According to the director, the drivers worked in conjunction with other workers who were blading and spreading the deposited fill material, thereby incorporating the fill into the site. Second, the director also found that the end-dump truck drivers drove over fill material in an activity akin to "rolling" within the meaning of the regulation, thus compacting the materials into the site.

¶12 The Companies sought review by the superior court. The court affirmed the director's decision in part, deciding that the end-dump truck drivers participated in incorporation of the fill material into the public works project. But the court further held that there was insufficient evidence to sustain the director's finding that the end-dump truck driver's drove over fill material in an activity akin to

---

[7] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Conclusion of Law 6 of Admin. Law Judge, Admin. R. at 3333.

"rolling." Accordingly, the court held that the end-dump truck drivers are entitled to be paid prevailing wages solely on the basis that they were "otherwise participating in incorporation of the delivered materials" into the project.

¶13 The Companies appeal. L&I did not cross appeal.

## PREVAILING WAGES ON PUBLIC WORKS

¶14 The Companies argue that the end-dump truck drivers did not spread, level, roll or otherwise participate in the incorporation of fill materials into the project site and thus are not entitled to prevailing wages. We agree.

¶15 An appeal from a notice of violation under Washington's prevailing wage statute is governed by the Administrative Procedure Act (APA), chapter 34.05 RCW.[8] We review the director's order, which is the final agency order.[9] In reviewing the director's administrative action, we sit in the same position as the trial court and apply the APA standards directly to the administrative record that was before the agency.[10] We review questions of law de novo, but we accord substantial weight to the agency's interpretation of the statutes that it administers.[11] We review findings of fact for substantial evidence in light of the whole record.[12] On mixed questions of law and fact, we determine the law independently, then apply it to the facts as found by the agency.[13]

---

[8] RCW 39.12.065(1).

[9] RCW 39.12.065(1).

[10] *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

[11] *Everett Concrete Prods., Inc. v. Dep't of Labor & Indus.*, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988) (citing *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983)).

[12] RCW 34.05.570(3)(e).

[13] *Hamel v. Employment Sec. Dep't*, 93 Wn. App. 140, 145, 966 P.2d 1282 (1998), *review denied*, 137 Wn.2d 1036 (1999).

■ ¶16 The prevailing wages on public works act[14] is remedial, and courts construe it liberally to protect the employees of government contractors from substandard earnings and to preserve local wage standards.[15] The employees, not the contractor or its assignee, are the beneficiaries of the act.[16]

■ ¶17 WAC 296-127-018 specifies the circumstances under which workers who deliver certain materials to a public works project site are entitled to prevailing wages. It states as follows:

**Coverage and exemptions of workers involved in the production and delivery of gravel, concrete, asphalt, or similar materials . . . .**

. . . .

(2) All workers, regardless of by whom employed, are subject to the provisions of chapter 39.12 RCW when:

(a) They deliver . . . materials to a public works project site *and perform any spreading, leveling, rolling, or otherwise participate in any incorporation of the materials into the project*; . . . .

. . . .

(3) Workers are *not subject* to the provisions of chapter 39.12 RCW when:

(a) The employees' duties *do not include spreading, leveling, rolling, or otherwise participating in the incorporation of the delivered materials into a public works project*, . . . .[17]

¶18 Examination of the plain words of the regulation makes clear that a worker's mere delivery of materials to the site, without more, is insufficient to trigger the duty to pay prevailing wages. The use of the conjunction "and" to

---

[14] RCW 39.12.020 states:

The hourly wages to be paid to laborers, workers, or mechanics, upon all public works and under all public building service maintenance contracts of the state or any county, municipality or political subdivision created by its laws, shall be not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality within the state where such labor is performed.

[15] *Everett Concrete*, 109 Wn.2d at 823.

[16] *Everett Concrete*, 109 Wn.2d at 823.

[17] WAC 296-127-018 (emphasis added).

join the first and second verbs of subsection (2)(a) makes this clear. Likewise, the exclusion from prevailing wage protection in subsection (3)(a) where drivers' duties do not include "spreading, leveling, rolling, or otherwise participating in the incorporation of the delivered materials" reinforces this conclusion.

¶19 *Superior Asphalt & Concrete Co. v. Department of Labor & Industries, (Superior I)* reached the same conclusion that more than mere delivery of materials is necessary to require the payment of the prevailing wage.[18] There, the court first addressed whether prevailing wages must be paid to truck drivers who delivered material to a public works project. The same regulation that is before us now was before that court.[19] The court established the principle that "the regulation . . . does not state that mere delivery triggers coverage; the worker must perform some *additional* task upon the public work."[20]

¶20 Here, the director's findings do not include any determination that the end-dump truck drivers either "spread" or "leveled" fill material within the meaning of the regulation. Based on the absence of such findings, we conclude that neither of these two activities is expressly at issue in this case.[21] Accordingly, the end-dump truck drivers do not qualify for the prevailing wage by virtue of either of these provisions.

¶21 L&I has abandoned on appeal the position it took below—that the end-dump truck drivers were involved in "rolling" fill within the meaning of the regulation. The superior court rejected that position, and L&I did not cross appeal. "Rolling" of fill is not at issue in this case. Thus, the end—dump truck drivers do not qualify for the prevailing wage by virtue of this provision.

---

[18] 84 Wn. App. 401, 929 P.2d 1120 (1996), *review denied*, 132 Wn.2d 1009 (1997).

[19] *Superior I*, 84 Wn. App. at 405-06.

[20] *Superior I*, 84 Wn. App. at 410 (emphasis added).

[21] *See e.g.*, *Kettle Range Conservation Group v. Dep't of Natural Res.*, 120 Wn. App. 434, 445, 85 P.3d 894 (2003), *review denied*, 152 Wn.2d 1026 (2004).

■ ¶22 The issue here is whether the end-dump truck drivers "otherwise participat[ed in any] incorporation" of the fill into the project. Only then do the activities of the end-dump truck drivers trigger the requirement under WAC 296-127-018(2)(a) to pay prevailing wages.[22]

■■ ¶23 Where a statute is unambiguous, we assume the legislature means what the statute says, and we will not engage in statutory construction past the plain meaning of the words.[23] When faced with general terms in a sequence with specific terms, the rule of ejusdem generis states that the general term is restricted to items similar to the specific terms.[24]

■ ¶24 Focusing on the activities of the truck drivers, as we must, we note that WAC 296-127-018(2)(a) uses the specific terms "spreading, leveling, [and] rolling" of materials to define what additional activity beyond delivery is required to trigger the requirement to pay the prevailing wage in this case. These terms are followed by the phrase "or otherwise participat[es] in any incorporation of the materials into the project." Applying the rule of ejusdem generis to the regulation, the former terms limit the generality of the latter. Specifically, the end-dump truck drivers in this case must otherwise participate in incorporation of fill material at the site in a manner similar to spreading, leveling, or rolling. Any other construction reads out of the regulation these latter three words of limitation that L&I chose to include in WAC 296-127-018.

---

[22] The word "incorporation" is not defined either by the statute authorizing this regulation or the regulation itself. Accordingly, we look to a dictionary to assist in interpreting this term for purposes of defining the rights of the parties. *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004).

According to *Webster's Dictionary* "incorporate" means "to combine (ingredients) into one consistent whole: unite ultimately (as into a new substance or presentation): blend, combine or mingle thoroughly to form a homogenous product . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1145 (1993).

[23] *In re Estate of Jones*, 152 Wn.2d 1, 11, 93 P.3d 147, 152 (2004) (citing *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 963-64, 977 P.2d 554 (1999)).

[24] *Jones*, 152 Wn.2d at 11 (citing *Dean v. McFarland*, 81 Wn.2d 215, 221, 500 P.2d 1244 (1972)).

■■■ ¶25 Whether the end-dump truck drivers "otherwise participated in incorporation" of the fill by the *method* of delivery to the site is the question that we must answer. L&I does not argue that the record shows anything similar to leveling or rolling of fill by the end-dump drivers. In any event, we see nothing in the record before us that would support such an argument.

¶26 We turn to the director's order and review that order with a proper construction of the governing regulation in mind. There does not appear to be any dispute that individual end-dump truck drivers remained in their trucks when they delivered fill and were at the site for approximately 5 to 15 minutes each.[25] A line of trucks entered the site, where the trucks were directed by CTI employees to specific spots where the trucks deposited fill directly on the embankment.[26] The end-dump truck drivers deposited fill from their trailers on the embankment, then moved forward and jackknifed the trucks to dump the remaining fill.[27] CTI bulldozer operators then knocked over and bladed the piles of fill material that the end-dump truck drivers had deposited.[28]

¶27 A key aspect of the director's assessment of these uncontested facts is set forth as follows:

> The fill material was deposited directly onto the embankment under construction where it was immediately used where it was placed. The process was very organized. By depositing the fill material directly onto the embankment under construc-

---

[25] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 6 of Dir's Order, Admin. R. at 3342.

[26] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 5 of Dir's Order, Finding of Fact 7, Admin. R. at 3342.

[27] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 5 of Dir's Order, Finding of Fact 7, Admin. R. at 3342.

[28] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 5 of Dir's Order, Finding of Fact 7, Admin. R. at 3342.

tion rather than to a stockpile for later use, CTI achieved greater efficiency. CTI eliminated the cost of paying the wage of a worker to move the fill material from a stockpile to the embankment under construction, the cost of fuel to operate equipment, and the cost of wear and tear on the equipment. Further, because the process was so efficient, the Project took less time to complete than it would otherwise have taken. The Respondents' drivers performed work that was necessary to the completion of the Project. The drivers displaced labor on the Project that would have been performed by CTI employees, or other workers on the Project site who would have been paid prevailing wage.[29]

¶28 Nowhere in this assessment is there any consideration of whether the *method* of delivery of fill by the end-dump truck drivers is similar to rolling, leveling, or spreading. As we have explained, the proper interpretation of the governing regulation requires that the participation of end-dump truck drivers in the incorporation of fill must be similar to one or more of these three limiting terms. Rather, the director's evaluation is focused on other factors—the deposit of fill directly on the embankment rather than in a central stockpile, efficiency of the operation, and the necessity of the work for the completion of the project. These factors fail to address the plain words of the regulation and thus do not provide the support required to sustain the determination by the director that prevailing wages are due the end-dump truck drivers.

¶29 One could argue that the method of delivery of the fill by the end-dump truck drivers in this case is similar to "spreading" and thus qualifies as "otherwise participating" in incorporation of the fill into the project. For example, one of the dictionary definitions of "spread" includes: "to distribute over an area."[30] And it is uncontested here that the end-dump truck drivers, while remaining in their trucks, delivered their loads directly to different locations on the

---

[29] Office of Dir. of Admin. Hr'gs for the Dep't of Labor & Indus. Proposed Finding of Fact 8 of Dir's Order, Admin. R. at 3343.

[30] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2208 (1993).

embankment, where CTI dozer operators knocked over and bladed the piles of fill as the drivers delivered them.

¶30 However, such an argument falls short of the requirements of the regulation. Rather, as we hold now and the *Superior* I court previously decided, an "additional task" upon the public work must be performed by the driver beyond mere delivery of material to entitle a driver to the prevailing wage.[31] Here, there is no additional task beyond mere delivery of the fill.

¶31 L&I relies heavily on *Superior Asphalt & Concrete Co. v. Department of Labor & Industries*[32] (*Superior* II), to support its argument that the end-dump truck drivers otherwise participated in incorporating the fill material into the project. A close reading of that case shows that it is distinguishable.

¶32 In *Superior* II, four different types of delivery were identified, three of which were examined. In the tailgate method of delivery, the driver dispenses the load at certain locations after arriving at the jobsite.[33] The driver maneuvers the truck into position, raises the bed of his truck, and empties the load.[34] The driver controls the flow rate of the materials by using a chain that restricts the tailgate opening and thus the thickness of the layer of materials deposited on the ground as the truck moves forward as his load empties.[35] "The tailgate method allows the delivery of materials directly onto the roadbed."[36]

¶33 "The belly dump method involves using a truck equipped with a release gate on the bottom (or belly) of the truck bed."[37] This method allows the driver to control the

---

[31] *Superior* I, 84 Wn. App. at 410.

[32] 112 Wn. App. 291, 49 P.3d 135 (2002), *review denied*, 149 Wn.2d 1003 (2003).

[33] *Superior* II, 112 Wn. App at 294.

[34] *Superior* II, 112 Wn. App at 294.

[35] *Superior* II, 112 Wn. App. at 294.

[36] *Superior* II, 112 Wn. App. at 294.

[37] *Superior* II, 112 Wn. App. at 294.

rate of the materials being dispensed and deliver materials directly on the work by moving his truck forward as it empties.[38]

¶34 The "spreader box or paving machine method" is where the dump truck driver backs the truck against a spreader machine, raises the truck bed, and delivers materials directly into the machine.[39] The truck driver must remain with the spreading machine and work in concert with the operator to ensure a proper flow of materials into the machine.[40] The spreader machine then lays the materials onto the roadbed.[41]

¶35 "In the stockpile method, the driver uses a dump truck and empties his load on the ground in a pile for future use."[42] To get the materials to the needed location, a front end bucket loader scoops up the materials and places it at the needed location.[43]

¶36 The court concluded that the first three of these methods constituted "more than just 'mere delivery.' "[44] According to the court, the drivers "either spread the material or, at the very least, participated in the incorporation of the materials into the public works."[45] This constituted "incorporation of those materials into the project . . . ."[46] In reaching these conclusions, the court explained that the tailgate and belly-dump methods achieved a certain level of spreading. Likewise, "emptying their loads directly into the spreading machine and coordinating with the machine operator to ensure a specific rate

---

[38] *Superior* II, 112 Wn. App. at 294.

[39] *Superior* II, 112 Wn. App. at 294.

[40] *Superior* II, 112 Wn. App. at 294.

[41] *Superior* II, 112 Wn. App. at 294.

[42] *Superior* II, 112 Wn. App. at 295.

[43] *Superior* II, 112 Wn. App. at 295.

[44] *Superior* II, 112 Wn. App. at 299.

[45] *Superior* II, 112 Wn. App. at 300.

[46] *Superior* II, 112 Wn. App. at 300.

of materials flow while the machine lays down a layer of the materials is a clear example of incorporating the materials into the construction process."[47] Thus, the court concluded those drivers were entitled to prevailing wage under WAC 296-127-018(2)(a).[48]

¶37 Here, none of the methods of delivery described in *Superior* II is before us. In this case, the end-dump truck drivers delivered the fill directly to the embankment, but they stayed in their trucks when they dumped the fill. They did not control the rate of flow of the fill out of the trucks. Nor did they work with a machine operator to ensure that fill entered a machine at a certain rate for application to the site. In short, there is no showing here that any additional task beyond delivery of the fill was performed by the end-dump truck drivers.

¶38 L&I cites to *Superior* II for the proposition that when the end-dump trucks deposited fill directly onto the embankment rather than stockpiling it at a central location, the need for front end loaders to transport the material was eliminated and therefore greater efficiency and cost savings resulted. While this may be true, the relevant inquiry for purposes of the regulation is whether the workers participated in "any incorporation of materials into the project." Nowhere in the language of the rule is there any support for examining efficiencies as part of the analysis. We will not read into the rule such a requirement. The same analysis and conclusion applies to the extent the director relied on the fact that the project took less time to complete as a result of the method of delivery of the fill to the site.

---

[47] *Superior* II, 112 Wn. App. at 300. The court, however, noted that an L&I memorandum dated December 10, 1992 specified methods of delivery it considered relevant for WAC 296-127-018. According to L&I, delivery of materials into a "true stockpile" that is physically separated from the actual location of construction and that must be physically moved from the stockpile to be put into service does not constitute incorporation of the materials (*Superior* II, 112 Wn. App. at 301 n.4; Admin. R. at 2370).

[48] *Superior* II, 112 Wn. App. at 300.

¶39 We conclude that the activities here do not exceed the "mere delivery" limitation defined by case authority and plainly indicated by the text of the regulation at issue here.

¶40 L&I relies on *Heller v. McClure & Sons, Inc.,*[49] for the proposition that " 'laborers, workers, or mechanics' are entitled to the prevailing wage when their work directly relates to the prosecution of the work that is contracted to be performed and necessary for the completion of that work."[50] While this is true, the plain words of the regulation are not as expansive as the proposition stated in that case.

¶41 In *Heller*, the question was whether Heller's work on equipment owned by McClure and used at several public works sites fell within the scope of the phrase "upon all public works."[51] *Heller* did not consider either the delivery of materials or WAC 296-127-018, the regulation now before us.[52]

¶42 Arguably, L&I could have written a more expansive regulation to cover the situation that is now before us—one more in line with the rule stated in *Heller*. But the regulation now before us is not as expansive as the rule stated in *Heller*.

¶43 For example, if the regulation did not contain the words of limitation—"spreading, leveling, [or] rolling," but included "participating in any incorporation of the materials into the project," we would be more inclined to agree with the argument that L&I makes here, provided some additional activity of the drivers beyond mere delivery of fill was involved. But we will not rewrite the statute by

---

[49] 92 Wn. App. 333, 963 P.2d 923 (1998), *review denied*, 137 Wn.2d 1028 (1999).

[50] *Heller*, 92 Wn. App. at 340.

[51] *Heller*, 92 Wn. App. at 338; RCW 39.12.020.

[52] *Heller*, 92 Wn. App. at 339-40 (*Heller* incorrectly states that the *Superior* I court "did not find that the incorporation of materials into the project was necessary for coverage." *Heller* "expressly declined to reach the issue of whether *mere delivery* of gravel to a public works project site would be covered by the act." *Superior* I did reach the issue, but declined to apply the regulation to the method of delivery that was involved in that case. We take this opportunity to correct the misstatement in *Heller*. The misstatement has no bearing on our conclusion that *Heller* is inapplicable here.).

ignoring the words of limitation here. While we acknowledge the remedial purposes of the prevailing wage statute and the liberal construction we must give such a statute, we cannot ignore the plain words of the regulation in effectuating the underlying purposes of the regulation.

¶44 We conclude that the activities here do not exceed the "mere delivery" limitation defined by case authority and plainly indicated by the text of the regulation at issue here. The end-dump truck drivers are not entitled to prevailing wages.

¶45 The Companies next argue that L&I's interpretation violates the equal protection clause of the constitution. They also argue that L&I should be estopped from enforcing its regulation. Because of our resolution of this case on other grounds, we need not address either of these issues.

## ATTORNEY FEES AND COSTS

¶46 The Companies seek attorney fees on the basis of RCW 4.84.350. Specifically, they ask this court to remand the matter of fees at trial to the superior court so that it may exercise its discretion. They also seek fees on appeal.

¶47 The trial court had no opportunity to consider the award of fees to the Companies because it ruled in favor of L&I. We, of course, review an award of fees by the trial court under the equal access to justice act, RCW 4.84.350, for abuse of discretion.[53] Accordingly, we remand the case to the trial court so that it may exercise its discretion whether fees should be awarded for the litigation in that court and, if so, to decide the amount of such fees.

¶48 As to fees on appeal, we decline to award them under the circumstances of this case. RCW 4.84.350 states in relevant part:

**Judicial review of agency action—Award of fees and expenses.**

---

[53] *Alpine Lakes Prot. Soc'y v. Dep't of Natural Res.*, 102 Wn. App. 1, 19, 979 P.2d 929 (1999); RCW 4.84.350.

(1) Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action *was substantially justified* or that circumstances make an award unjust. A qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought.[54]

■ ¶49 While the statute authorizes attorney fees to the prevailing party, such an award may be avoided if the agency's action was reasonable and substantially justified, even if ultimately found incorrect.[55] Here, L&I must show that its notice of wage violation was "justified to a degree that could satisfy a reasonable person."[56]

■ ¶50 The only argument that the Companies make on appeal to justify the award is that L&I waited until the project was concluded to investigate and waited an additional 18 months to issue notices of violations. While L&I does not directly address this argument, we are unpersuaded that mere delay in investigation and issuing notices without a showing of prejudice supports the award of fees on appeal.

■ ¶51 More importantly, while we differ with L&I's arguments, they are not unreasonable. There is language in *Superior* II that supports the position that L&I took in this litigation. Given that language and the fact that L&I has a statutory obligation to pursue wage claims and that the system of statutes is remedial, L&I's position was substantially justified. Accordingly, we deny fees on appeal.

¶52 The Companies also requests costs on appeal, which L&I concedes would be available if the Companies prevail. We award costs, subject to timely compliance with RAP

---

[54] (Emphasis added.)

[55] *Constr. Indus. Training Council v. Wash. Apprenticeship & Training Council*, 96 Wn. App. 59, 68, 977 P.2d 655 (1999).

[56] *Plum Creek Timber Co. v. Forest Practices Appeals Bd.*, 99 Wn. App. 579, 595, 993 P.2d 287, 292 (2000).

18.1. We direct the superior court, on remand, to determine the proper amount of costs.[57]

¶53 We reverse and remand for further proceedings.

AGID and APPELWICK, JJ., concur.

Review granted at 155 Wn.2d 1001 (2005).